# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------x
JOHN HANCOCK LIFE & HEALTH    :
INSURANCE COMPANY,             :

                                :   Case No.: 3:25-cv-07574 (MAS) (JBD)
             Plaintiff,      :
    v.                       :
                                :
CARING CONNECTIONS LLC,    :
ARTHUR FELDHEIM,           :
and BLIME a/k/a VERA FELDHEIM,  :
                                :
          Defendants.      :
-------------------------------------------------------x

### PLAINTIFF'S FIRST AMENDED COMPLAINT WITH JURY DEMAND

Plaintiff John Hancock Life & Health Insurance Company ("John Hancock" or "Plaintiff"), by and through its counsel, Sichenzia Ross Ference Carmel LLP, alleges for its First Amended Complaint against Caring Connections LLC ("Caring Connections"), Arthur Feldheim ("Mr. Feldheim"), and Blime a/k/a Vera Feldheim ("Mrs. Feldheim") (Mr. Feldheim and Mrs. Feldheim, collectively, the "Feldheims", and collectively with Caring Connections, the "Defendants"), as follows:

<u>INTRODUCTION</u>

1. This action arises from the Feldheims' deliberate actions to defraud John Hancock out of long-term care insurance payments, aided and abetted by their licensed home health agency, Caring Connections. John Hancock brings this action against Defendants for the return of those ill-gotten payments, which total approximately $1,278,337.51.

2. John Hancock issued Long-Term Care Insurance Policies to Mr. and Mrs. Feldheim (each, the "LTC Policy," and collectively the "LTC Policies") and later approved the Feldheims'

retention of Caring Connections to provide caregiver services to each of them under claims made pursuant to their respective LTC Policies.

3. From April 2018 to November 2018, while the Feldheims resided in New York, John Hancock reimbursed Mrs. Feldheim $58,240.40 for alleged services rendered under her LTC Policy; however, of that amount, the Feldheims paid Caring Connections only $17,234.16 to assist Mrs. Feldheim. In other words, the Feldheims pocketed the difference, totaling $41,006.24, and/or used the balance to pay unapproved and undisclosed caregivers away from Caring Connections in violation of Mrs. Feldheim's LTC Policy. Unfortunately, those early fraudulent acts were just the start.

4. Beginning in December 2018, when the Feldheims moved to New Jersey, Caring Connections ceased providing any caregiver services to Mrs. Feldheim. Thereafter, until July 2024, by their own admission, the Feldheims hired independent, unapproved, and unidentified caregivers unaffiliated with Caring Connections to care for Mrs. Feldheim in violation of the explicit and unambiguous terms of the LTC Policy. Mr. Feldheim has admitted that these caregivers are not United States citizens and are not legally residing in the United States, which means they could not have held the professional licenses or certifications required under the LTC Policy. During that period, the Feldheims paid those unapproved caregivers in cash from the $1,005,009.00 Mrs. Feldheim received from John Hancock based upon her continued misrepresentations in falsified invoices that Caring Connections had provided her caregivers.

5. Mr. Feldheim was no more forthright with John Hancock than his wife. The reimbursement payments John Hancock made to Mr. Feldheim for the claims under his LTC Policy commencing in February 2019 were based on false invoices similarly prepared by Caring Connections. What is more, the services were not performed by eligible caregivers employed by

his sole approved service provider, Caring Connections. Instead, Mr. Feldheim personally hired and managed his unapproved caregivers, whom he paid directly in cash. Indeed, Caring Connections never provided caregivers to Mr. Feldheim. Even so, John Hancock reimbursed Mr. Feldheim $232,322.27 under his LTC Policy based upon his continued representations that Caring Connections had provided his caregivers.

6.    Even as the Feldheims blatantly violated the terms of the LTC Policies and defrauded John Hancock—effectively extracting potential long-term care resources from John Hancock's other, law-abiding, Long-Term Care policyholders—Caring Connections knowingly participated in this fraudulent conduct because it was paid handsomely to do so. Caring Connections had actual knowledge that it was not providing caregivers to the Feldheims, yet it continued to submit invoices on its letterhead falsely representing that it was the "Provider" of home health care services to the Feldheims. Since at least December 2018 for Mrs. Feldheim and February 2019 for Mr. Feldheim, despite all the Feldheims' caregivers being paid directly by the Feldheims without any oversight from Caring Connections, the Feldheims each paid Caring Connections at least $2,448.80 per month for "administrative services," which was limited to submitting on their behalf fraudulent invoices to John Hancock on its letterhead for reimbursement under the LTC Policies.

7.    While the Feldheims claimed to have been paying Caring Connections to provide "administrative services" for their claims, Caring Connections' own administrator has admitted to John Hancock that Caring Connections has no record of any contact with the Feldheims' actual caregivers, has no information about the Feldheims' actual caregivers or their qualifications, cannot identify or explain the signatures on the invoices submitted to John Hancock on its company

3

letterhead seeking reimbursement under the LTC Policies, and cannot even explain the basis for its administrative fees, which total $364,496.58 for the period December 2018 through June 2024.

8.      The LTC Policies are unambiguous and require home health care to be provided to insureds consistent with a care plan implemented by a Home Health Care provider, defined under the LTC Policies as a home health agency or independent home health care provider that provides home health care through two or more employees of an organization in the business of providing home health care according to the laws of the jurisdiction in which it is located.

9.      Instead of following the provisions of the LTC Policies, the Feldheims, aided and abetted by Caring Connections, paid various caregivers with cash in New York and New Jersey, as well as in Florida when the Feldheims vacationed. In other words, there was no legitimacy in the manner in which the Feldheims, and by extension Caring Connections, accepted and utilized the benefits reimbursed by John Hancock under the LTC Policies. Rather, Defendants acted in concert for over six years to enrich themselves while misleading and misinforming John Hancock.

10.     The foregoing acts constitute blatant insurance fraud by Defendants.

11.     Yet despite being caught "red-handed," Defendants have refused to return to John Hancock the ill-gotten fruits of their deceptive, manipulative, and exploitative practices.

12.     Each such act of insurance fraud adversely affects not just John Hancock, but the insurance costs and coverage options for every American seeking long-term care insurance coverage. One key reason the cost of long-term care insurance has increased substantially over the past few decades is because of unscrupulous attempts by insureds and their co-conspirator "health care providers," such as Caring Connections, to manipulate and misuse the benefits paid by insurance companies, thus decreasing the amount of actual coverage available to innocent other insureds while contemporaneously increasing the cost and risks to insurers to provide such

coverage. This anti-consumer behavior should not be rewarded—or borne by other policyholders—and Defendants must return the improperly obtained monies to John Hancock.

PARTIES

13. John Hancock Life & Health Insurance Company is an insurance company organized and existing under the laws of the State of Delaware, with its principal place of business located in Boston, Massachusetts. At all relevant times, John Hancock has been in the business of underwriting policies of long-term care insurance and is authorized to transact business in the State of New Jersey.

14. Caring Connections, LLC is a limited liability company and licensed geriatric home health care service organized and existing under the laws of the State of New York, with its principal place of business located in Airmont, New York. Caring Connections was the registered home health care services provider to Mrs. Feldheim beginning in April 2018 and the registered home health care services provider to Mr. Feldheim beginning in February 2019.

15. Arthur Feldheim is a natural person, an insured person under his LTC Policy, and a resident of Lakewood, New Jersey.

16. Blime a/k/a Vera Feldheim is a natural person, an insured person under her LTC Policy, and a resident of Lakewood, New Jersey.

JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this is the judicial district in which the Feldheims reside, and also because this is the judicial district in which

5

a substantial part of the acts and omissions giving rise to Plaintiff's claims against Defendants occurred.

BACKGROUND

*Mrs. Feldheim and Caring Connections*

19.    Mrs. Feldheim, who is approximately 80 years old, purchased her LTC Policy from John Hancock in or about March 2004, when she was approximately 59 years old. At that time, she resided in Monsey, New York. A true and correct copy of Mrs. Feldheim's LTC Policy is attached as **Exhibit 1**.

20.    In or about April 2018, Mrs. Feldheim began making claims against her LTC Policy.

21.    On or about May 27, 2018, Blime Feldheim signed a Claim Initiation Form and submitted it to John Hancock to formally establish her entitlement to reimbursement under her LTC Policy. A true and correct copy of Mrs. Feldheim's Claim Initiation Form is attached as **Exhibit 2**.

22.    In conjunction with the Claim Initiation Form, on a Medical & Long Term Care Service Provider Information Form, Blime Feldheim identified two care providers, both family members.

23.    Because her LTC Policy does not permit family members to serve as providers (unless they are, among other things, a regular employee of a licensed care service provider, such as a "Home Health Care Agency," as defined in the Policy), in response to John Hancock raising the issue to her, Mrs. Feldheim advised John Hancock on May 28, 2018 that she would instead hire a licensed aide to provide services consistent with her LTC Policy.

6

24.      On or about June 5, 2018, John Hancock sent Mrs. Feldheim a letter confirming that it received her Claim Initiation, and that it would begin evaluating her claim.  As a part of that process, John Hancock informed her that it would review the care provider she designated for eligibility under her LTC Policy.  The letter also informed her that if she later changed providers, she was required to inform John Hancock to establish the new provider's eligibility.

25.      Mrs. Feldheim then retained Caring Connections to provide her caregivers as a home health care provider, and informed John Hancock of the same.

26.      On or about June 12, 2018, John Hancock sent Mrs. Feldheim a letter confirming that Caring Connections was an eligible provider of services as a Home Health Care Agency but cautioned that "[p]rovider approval is based on the information submitted to us and is contingent upon the provider's employed staff providing covered services to you." The letter also reminded Mrs. Feldheim that "if you change providers in the future, please contact John Hancock as soon as possible to ensure that your new provider meets policy requirements…" A true and correct copy of the June 12, 2018 letter is attached as **Exhibit 3**.

27.      Between approximately April 1, 2018 and November 30, 2018, Caring Connections provided home health care assistance to Mrs. Feldheim in her New York home through three of its caregivers.

28.      In connection with those services, Caring Connections invoiced Mrs. Feldheim for the services it provided. Caring Connections submitted its invoices on Mrs. Feldheim's behalf to John Hancock under Mrs. Feldheim's LTC Policy for Caring Connections' caregiver's services, at a rate of $480/day.  A true and correct copy of one of Caring Connections' facsimiles to John Hancock, dated October 16, 2018, is attached as **Exhibit 4**.

7

29.    During this period, while Caring Connections did provide care giving services to Mrs. Feldheim, John Hancock reimbursed Mrs. Feldheim $58,240.40 for alleged services rendered under her LTC Policy; however, of that amount, the Feldheims paid Caring Connections only $17,234.16 to assist her, which means John Hancock overpaid Mrs. Feldheim $41,006.24 for services that were either not performed or performed by unapproved caregivers in violation of the Mrs. Feldheim's LTC Policy.

30.    In or about December 2018, Mrs. Feldheim stopped using caregivers from Caring Connections when the Feldheims moved from Monsey, New York to Lakewood, New Jersey.

31.    Even so, through June 2024, Mrs. Feldheim and Caring Connections agreed that, without John Hancock's knowledge or approval, Caring Connections would continue to create and submit invoices on its letterhead to John Hancock to make it appear as though Caring Connections was still providing caregiving services in order to fraudulently obtain benefits under Mrs. Feldheim's LTC Policy.

32.    Caring Connections created these false invoices on its letterhead and submitted them to John Hancock on behalf of Mrs. Feldheim on a biweekly basis via facsimile or online portal until mid-July 2024.

33.    Those invoices falsely stated that Caring Connections was billing Mrs. Feldheim for caregiving services provided by Caring Connections at a rate of $480/day, which later increased to $645/day. A true and correct copy of an invoice Caring Connections created, billing Mrs. Feldheim for services rendered and submitted to John Hancock, dated July 19, 2022, is attached as **Exhibit 5**; a similar invoice dated April 21, 2024 is attached as **Exhibit 6**.

34.    When Caring Connections submitted the false invoices and work logs via online portal, it acknowledged that "an individual who submits an invoice with an intent to defraud or

8

knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties."

35.    To reward Caring Connections for participating in the fraudulent scheme, Mrs. Feldheim paid Caring Connections a monthly fee of $2,448.80 using funds she admittedly received from John Hancock under her LTC Policy, despite that Caring Connections was not providing her with caregiving services and this misuse of funds violated the terms of Mrs. Feldheim's LTC Policy.

36.    Instead, from December 2018 onward, Mrs. Feldheim was receiving care from caregivers who were not employed by Caring Connections nor approved by John Hancock to provide compensable services under Mrs. Feldheim's LTC Policy. Moreover, these caregivers, according to Mr. Feldheim, are not American citizens and are not legally residing in the United States.

37.    After Caring Connections ceased providing caregivers to Mrs. Feldheim, its representatives stopped signing the weekly logs that Caring Connections attached to its invoices and submitted to John Hancock. Instead, an undisclosed person signed the weekly logs under "Caregiver Signature" from March 2019 to March 2024.

38.    At times, the signatures on those logs were photocopies.

39.    Beginning in 2022, in many instances, a "caregiver" did not "sign" the logs at all. Mrs. Feldheim, however, signed some of the logs, including the Client Weekly Documentation Log attached to the invoice dated April 21, 2024, thereby misrepresenting to John Hancock that Caring Connections was providing her with caregivers. *See* **Exhibit 6**.

*Mr. Feldheim and Caring Connections*

40.     Mr. Feldheim, who is approximately 84 years old, purchased his LTC Policy from John Hancock in or about March 2004, when he was approximately 63 years old. At that time, he resided in Monsey, New York. Mr. Feldheim's LTC Policy contains terms identical to Mrs. Feldheim's LTC Policy (**Exhibit 1**). In or about December 2018, Mr. Feldheim moved to Lakewood, New Jersey.

41.     On January 20, 2019, after he had moved to New Jersey, Mr. Feldheim signed a Claim Initiation Form and in February 2019 began making claims against his LTC Policy. A true and correct copy of Mr. Feldheim's Claim Initiation Form is attached as **Exhibit 7**.

42.     Mr. Feldheim also retained Caring Connections to act as a home health care provider; however, Caring Connections never provided Mr. Feldheim with caregivers.

43.     Rather, Caring Connections agreed with Mr. Feldheim to create invoices on its letterhead that falsely billed Mr. Feldheim for care services that it never provided him.

44.     Caring Connections submitted those false invoices and attached weekly work logs to John Hancock on Mr. Feldheim's behalf on a biweekly basis via fax or online portal until mid-July 2024.  A true and correct copy of a Caring Connections submission to John Hancock, dated January 20, 2020, is attached as **Exhibit 8** (stating on the fax cover sheet "ATTACHED PLEASE SEE INVOICES SERVICES FROM COMPANION CARE SERVICES January 4th thru January 17th…Caring connections home care provider"). These submissions gave the false appearance that Caring Connections was providing the invoiced care services to Mr. Feldheim.

45.     Mr. Feldheim also paid Caring Connections a monthly fee of $2,448.80 to submit false invoices to John Hancock for reimbursement under his LTC Policy. Mr. Feldheim has

10

admitted to John Hancock that he used funds he received from John Hancock to pay Caring Connections.

46. Like Mrs. Feldheim, Mr. Feldheim's invoices attached work logs that reflected an unidentified caregiver.

47. During the relevant period, Mr. and Mrs. Feldheim routinely spent the beginning of January through the end of March in Miami, Florida. For example, the Feldheims were present in Miami, Florida during at least a portion of the two-week period preceding Caring Connections' February 13, 2023 submissions to John Hancock, as evidenced by John Hancock's investigation.

48. Despite Mr. and Mrs. Feldheim's presence in Miami during this period in February 2023, Caring Connections continued creating invoices for services it purportedly provided to Mr. and Mrs. Feldheim in New Jersey, submitted them on a biweekly basis to John Hancock, and when submitting via online portal, affirmatively answered "Yes" to the question "Were the care services performed at home?"—a statement Caring Connections knew to be false.

49. In its February 13, 2023, submissions to John Hancock on Mr. and Mrs. Feldheim's behalf, Caring Connections answered "Yes", that "the care services [for the previous two weeks were] performed at home" despite the Feldheims' presence in Florida for at least a portion of that period. They also identified Caring Connections as the "Provider." True and correct copies of the February 13, 2023, submissions are attached as **Exhibits 9 and 10**.

50. These extensive annual trips by the Feldheims were never disclosed to John Hancock while the Feldheims and Caring Connections were collecting on claim payments under the LTC Policies. Further, on their trips, the Feldheims either brought their unapproved New Jersey caretakers with them to Miami, Florida or received services from family members and other unapproved local caregivers.

11

51. The Feldheims failed to disclose to John Hancock these regular trips and extended stays in Miami, Florida, yet continued to submit, with Caring Connections' active assistance, false invoices to John Hancock for reimbursement of home health care as if Caring Connections had provided them care in New Jersey through its approved caregivers. John Hancock, unaware of Defendants' misdeeds, paid these—and all the other—invoices.

52. Moreover, Mr. Feldheim has admitted that he was hospitalized for multiple days in 2024, yet Caring Connections submitted invoices on his behalf for home health care reimbursement on those same days he was in the hospital. Under his LTC Policy, Home Health Care "does not include a hospital or rehabilitation facility/hospital."

*John Hancock Uncovers Defendants' Scheme*

53. In 2024, John Hancock investigated the Feldheims' claims made under the LTC Policies.

54. John Hancock's investigation revealed that the actual caregivers for the Feldheims did not complete or sign the activity logs submitted to John Hancock to receive payment. Instead, according to one caregiver, the Feldheims' son-in-law completed the logs.

55. Caring Connections has confirmed that at least four of the Feldheims' known, longtime caregivers over the past three years are not, and never were, employees of Caring Connections.

56. Caring Connections cannot explain to John Hancock the basis of monthly fees it received from the Feldheims for the "administrative services" it purportedly provided to them.

57. Caring Connections has no records of contact with the Feldheims, the Feldheims' health issues necessitating care, nurse visits, or whether Caring Connections ever provided fill-in caretakers for the Feldheims after they moved to New Jersey in or around December 2018.

12

58. The LTC Policies, each of which have identical terms, provide "Long-Term Care Services," which include coverage for "Home Health Care" by a "Home Health Care Provider," including "medical and non-medical professional or personal care services provided" in the home.

59. The LTC Policies define a "Home Health Care Provider" as a "Home Health Agency" or "Independent Home Health Care Provider."

60. Under the terms of the LTC Policies, Home Health Agencies providing care to the insureds are required to be either: (1) licensed in the jurisdiction in which Home Health Care is provided; (2) have a Medicare, JCAHO or CHAP Certification, or (3) be an organization that provides Home Health Care through two or more employees of an organization in the business of providing Home Health Care under the laws of the jurisdiction—in this case, New Jersey.

61. Under the terms of the LTC Policies, outside of Home Health Care Agencies, care may also be provided to insureds by an "Independent Home Health Care Provider," specifically: a licensed registered nurse; vocational nurse; practical nurse; physical therapist; occupational therapist; speech therapist; respiratory therapist; licensed social worker; registered dietitian; certified home health aide; certified nurse aide; or a government-sponsored nurse aide. Any aide outside the foregoing is required to submit written documentation that he or she has completed an established training course.

62. The care provider, whether a Home Health Care Agency or Independent Home Health Care Provider, must be approved by John Hancock in order for the LTC Policyholder to receive benefits under the LTC Policy.

63. None of the caregivers employed by the Feldheims from December 2018 onward, for which they received reimbursement from John Hancock under the LTC Policies, met any of the foregoing criteria, either as a Home Health Agency or Independent Home Health Care

13

Provider. In addition, none of the aides assisting the Feldheims submitted written documentation of any established training coursework, and none of them were approved by John Hancock as an Independent Home Health Care Provider.

64.    To receive benefits under the LTC Policies, the Feldheims were required to "receive care or services that are [. . .] covered under this Policy."

65.    Charges not covered under the LTC Policies include "charges for care or services which are not consistent" with the insured's plan of care.

66.    The LTC Policies also do not cover care provided by members of the insured's immediate family unless those family members are themselves licensed caregivers as described above and are approved by John Hancock.

67.    Accordingly, the Feldheims were not entitled to compensate unapproved caregivers, or family members, in cash under the terms of the LTC Policies.

68.    In addition, when John Hancock requested records from the Feldheims demonstrating their payments to the unapproved caregivers, the Feldheims provided bank statements that were temporally inconsistent with payments made to the Feldheims by John Hancock under the LTC Policies. Further, the Feldheims paid their unapproved caregivers hourly wages that did not equate to the hourly billable rate charged to John Hancock. In other words, there is no correlation between the reimbursements paid by John Hancock to the Feldheims under the LTC Policies and the cash payments flowing from the Feldheims to their unapproved caregivers.

69.    The Feldheims and Caring Connections actively concealed their fraud from John Hancock, including by maintaining the appearance of a legitimate provider relationship through Caring Connections' letterhead, logo, and submissions; using photocopied signatures; and by executing the January 2024 Service Agreements.

14

70.    The Feldheims, as John Hancock insureds, are charged with the duty of reading their LTC Policies.

71.    Accordingly, the Feldheims were fully aware of the LTC Policies' terms, including those terms referring or relating to the retention of caregivers for home health care.

72.    Caring Connections has had multiple clients who are insured by John Hancock and signed John Hancock Home Health Care Forms, in which it acknowledged, *inter alia*, that: "Any person who, with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties." A true and correct copy of the John Hancock Home Health Care Form executed by Caring Connections on August 21, 2024 is attached hereto as **Exhibit 11**.

73.    Further, each time Caring Connections submitted its Feldheim invoices to John Hancock via online portal, it acknowledged the same warning.

*Summary of Factual Allegations*

74.    For several months in 2018, Caring Connections provided Mrs. Feldheim with caregiving services and oversaw the Feldheims' administrative and billing matters with respect to payment for those caregivers, including submitting the Feldheim caregivers' logs and invoices to John Hancock, because Caring Connections was directly providing care to the Feldheims.

75.    However, starting no later than in December 2018 for Mrs. Feldheim and in February 2019 for Mr. Feldheim, Caring Connections created invoices in which it purported to bill each of Mr. and Mrs. Feldheim for caregiving services it provided. Those invoices were false, as Caring Connections did not provide the Feldheims with caregivers.

15

76.     Instead, the Feldheims each hired their own unapproved caregivers, and Caring Connections continued invoicing them for services that it no longer provided. Caring Connections then submitted those invoices to John Hancock on their behalf, and was wrongly paid by the Feldheims from their LTC Policy reimbursement benefits to do so.

77.     Caring Connections deliberately submitted invoices on its letterhead to John Hancock claiming that all services had been performed by Caring Connections' employees, knowing full well that it was not providing the Feldheims with any care whatsoever.

78.     Defendants have repeatedly committed, and/or aided and abetted in the commission of, insurance fraud and knowingly overbilled John Hancock under the LTC Policies for services Defendants knew were ineligible for coverage.

AS AND FOR A FIRST CAUSE OF ACTION<br>(Fraud – Against Arthur and Blime a/k/a Vera Feldheim)

79.     John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

80.     The Feldheims purchased the respective, identical, LTC Policies from John Hancock in 2004.

81.     John Hancock issued the respective LTC Policies to the Feldheims.

82.     The Policies' terms provided that any caregivers providing long-term care to the Feldheims at home needed various certifications or qualifications to be paid under the LTC Policies for rendering such care.

83.     When making a claim against her LTC Policy, Mrs. Feldheim misrepresented her intention to John Hancock to use the benefits under the LTC Policy to compensate "licensed aides" but instead used the benefits paid by her LTC Policy to employ unknown, unapproved aides who were not legal residents of the United States. Specifically, on May 28, 2018, Mrs. Feldheim

16

represented to John Hancock that she would hire a licensed aide to provide services consistent with her LTC Policy. This representation was false when made, or became false no later than December 2018 when Mrs. Feldheim ceased using Caring Connections' caregivers and instead retained unlicensed, unapproved individuals paid in cash.

84.     Mrs. Feldheim further misrepresented to John Hancock that she would be receiving home health care services in accordance with the benefits payable under the LTC Policy from Caring Connections.

85.     Mrs. Feldheim directed and/or authorized Caring Connections to submit invoices on her behalf to John Hancock purporting to evidence home health care services rendered by Caring Connections, a licensed and approved provider, instead of the unlicensed providers she was paying in cash to render such services.

86.     The submissions made to John Hancock by Caring Connections on Mrs. Feldheim's behalf falsely stated "Provider: Caring Connections LLC."  A true and correct example of Mrs. Feldheim's false submissions to John Hancock is attached as **Exhibit 12**, dated February 18, 2019.

87.     The submissions also included an invoice from Caring Connections, on Caring Connections' letterhead, with "Bill To Vera Blimy Feldheim" for "COMPANION CARE SERVICE [DATE]", falsely stating that Caring Connections was billing her for services that it provided.

88.     The submissions attached "Client Weekly Documentation Logs" that have Caring Connections' corporate logo on the top.  Above the caregiver signature line, it states "Please notify office if client requests additional personal care services that are not noted in this client's care plan," falsely indicating that the caregiver reflected on the log was employed by Caring Connections.

17

89.     It also stated above the caregiver signature line "By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so."  This also falsely indicated that the caregiver reflected on the log was employed by Caring Connections.

90.     Those misrepresentations began no later than in December 2018, and occurred on a biweekly basis until mid-July 2024. They were transmitted to John Hancock by facsimile or online portal. Each biweekly submission was a separate act of fraud.

91.     Mrs. Feldheim directed and authorized Caring Connections to submit the biweekly invoices to John Hancock on her behalf, each listing Caring Connections as "Provider" and billing at least $480/day, despite knowing that Caring Connections was not providing caregiver services to her.

92.     In addition, Mrs. Feldheim's misrepresentations were further memorialized in a signed agreement with Caring Connections.  On or about January 1, 2024—more than five years after Caring Connections had ceased providing any caregivers to her—Mrs. Feldheim signed a Service Agreement (Funded) expressly consenting to Caring Connections "provid[ing] Home Health services" via a "PCA/HHA" funded by her private long-term care insurance. That agreement further stated that Caring Connections' billing procedure "requires each employee(s) assigned and providing service to this case to complete a care note to be presented for signature at the end of each week." The agreement falsely represented that Caring Connections was providing caregivers to Mrs. Feldheim when, in fact, it was not.

93.     When making a claim against his LTC Policy, Mr. Feldheim misrepresented to John Hancock that he would receive home health care services in accordance with the benefits

18

reimbursable under the LTC Policy from Caring Connections. Specifically, in his initial Claim Initiation Form submitted in or about February 2019, Mr. Feldheim identified Caring Connections as his home health care provider and represented that Caring Connections would provide caregiving services to him. This representation was false when made because Caring Connections never provided any caregivers to Mr. Feldheim.

94.    Mr. Feldheim directed and authorized Caring Connections to submit invoices on his behalf to John Hancock purporting to evidence home health care services rendered by Caring Connections, a licensed and approved provider, instead of the unlicensed and unapproved providers he was paying in cash to render such services.

95.    The submissions made to John Hancock by Caring Connections on Mr. Feldheim's behalf falsely stated "Provider: Caring Connections LLC."  *See, e.g.*, **Exhibit 10**.

96.    The submissions also included an invoice from Caring Connections, on Caring Connections' letterhead, with "Bill To Arthur Feldheim" for "COMPANION CARE SERVICE [DATE]", falsely stating that Caring Connections was billing him for services that it provided.

97.    The submissions attached "Client Weekly Documentation Logs" that have Caring Connections' logo on the top.  Above the signature lines, it states "Please notify office if client requests additional personal care services that are not noted in this client's care plan," falsely indicating that the caregiver providing him with care was employed by Caring Connections.

98.    The submissions also stated above the signature line "By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so."  This falsely indicated that the caregiver was employed by Caring Connections.

19

99.     Those misrepresentations began no later than January 2019 and occurred on a biweekly basis until mid-July, 2024.  They were transmitted to John Hancock by facsimile or online portal. Each biweekly submission was a separate act of fraud.

100.     Mr. Feldheim directed and authorized Caring Connections to submit the biweekly invoices to John Hancock on his behalf, each listing Caring Connections as "Provider" and billing for each day of service allegedly provided, despite knowing that Caring Connections never provided any caregivers to him.

101.     Mr. Feldheim's misrepresentations were similarly memorialized. On or about January 1, 2024, Mr. Feldheim signed a Service Agreement (Funded) with Caring Connections expressly consenting to Caring Connections "provid[ing] Home Health services" via a "PCA/HHA" funded by his private long-term care insurance, and acknowledging that Caring Connections' billing procedure "requires each employee(s) assigned and providing service to this case to complete a care note." Mr. Feldheim signed this agreement despite knowing that Caring Connections had never provided any caregivers to him and would not do so in the future.

102. In sum, from December 2018 for Mrs. Feldheim and February 2019 for Mr. Feldheim through July 2024, Arthur and Blime Feldheim directed Caring Connections to submit biweekly invoices to John Hancock—including, by way of example, invoices dated February 18, 2019 (**Exhibit 12**); January 20, 2020 (**Exhibit 8**); July 19, 2022 (**Exhibit 5**); February 13, 2023 (**Exhibits 9 and 10**); and April 21, 2024 (**Exhibit 6**)—each falsely representing that: (a) Caring Connections was the "Provider" of home health care services; (b) the services on accompanying Weekly Documentation Logs were performed by Caring Connections caregivers; (c) the care services were "performed at home" in Lakewood, New Jersey; and (d) the submitting individual understood that fraudulent invoice submission constitutes insurance fraud. These invoices were

submitted via facsimile or online portal by Caring Connections on the Feldheims' behalf, and true and correct copies of representative invoices are attached hereto in the foregoing exhibits.

103. The foregoing statements were present material misrepresentations of fact because they determined whether the Feldheims would continue to receive, and be able to substantiate, the benefits they were being reimbursed for by John Hancock under the LTC Policies.

104. The foregoing statements were collateral to the insurance contracts between Mrs. Feldheim and John Hancock and Mr. Feldheim and John Hancock, respectively, because the aforementioned invoices and logs were not part of the LTC Policies, but rather were third-party documents used to induce continued payments.

105. The Feldheims knew that their representations to John Hancock were false and that services performed by unlicensed aides and family members were expressly excluded from coverage under their LTC Policies.

106. The Feldheims had actual knowledge that their representations to John Hancock were false, as demonstrated by: (a) Mr. Feldheim's admission that the caregivers are not American citizens and are not legally residing in the United States, which means they could not have been licensed or certified as required by the LTC Policies; (b) the Feldheims' physical presence in Miami, Florida, for approximately three months each year (January through March) while invoices represented that services were being rendered in Lakewood, New Jersey; (c) the Feldheims' direct cash payments to unapproved caregivers unaffiliated with Caring Connections; and (d) the Feldheims' use of family members as caregivers.

107. The Feldheims knew that their representations to John Hancock were false and that Caring Connections was not providing them with caregiving services.

21

108.    The Feldheims signed fraud acknowledgments in their Initial Claim Forms warning that submitting a claim "containing a false or deceptive statement" constitutes insurance fraud and may subject the signatory to criminal and civil penalties. True and correct copies of the Claim Initiation Forms signed by Mrs. Feldheim dated May 27, 2018 and by Mr. Feldheim on January 20, 2019, are attached as **Exhibits 2 and 7**. The Feldheims were thus on notice that the representations they were making—or authorizing Caring Connections to make on their behalf— had legal consequences.

109.    Notwithstanding, the Feldheims made the misstatements to John Hancock to induce its reliance in the form of John Hancock's issuance of continued benefit payments to plunder a total of approximately $1,278,337.51 under their two LTC Policies.

110.    John Hancock's reliance upon the Feldheims' statements was justifiable because the Feldheims, in submitting claims to John Hancock for payment, did so through a licensed home health care agency, Caring Connections—even though that agency was not actually rendering any home health care to the Feldheims. Therefore, until investigating the matter, John Hancock had no reason not to rely upon the accuracy of the Feldheims' statements.

111.    John Hancock overpaid the Feldheims, based upon the Feldheims' knowing and deliberate misrepresentations, in an amount not less than $1,278,337.51 exclusive of costs and interest.

112.    The Feldheims have refused to return the fraudulently obtained $1,278,337.51, notwithstanding John Hancock's demand.

AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Contract – Against Arthur and Blime a/k/a Vera Feldheim)

113.    John Hancock repeats and re-alleges each and every allegation set forth above as if more fully set forth herein.

22

114.    The LTC Policies are insurance contracts offered, negotiated, and accepted as between John Hancock and Mr. Feldheim, and John Hancock and Mrs. Feldheim, respectively.

115.    John Hancock fully performed its obligations under the LTC Policies to the Feldheims by paying for what they understood to be covered long-term care services as defined by the LTC Policies.

116.    However, the Feldheims repeatedly breached the terms of the LTC Policies on a monthly basis over a six-year period by accepting the benefits thereunder while retaining unidentified, unlicensed caregivers instead of the licensed caregivers required under the LTC Policies, and paying them unsubstantiated amounts of cash for which they sought reimbursement from John Hancock.

117.    John Hancock has been damaged by the Feldheims' breaches in an amount not less than $1,278,337.51, exclusive of costs and interest.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
(Fraud – Against Caring Connections LLC)

118.    John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

119.    The Feldheims purchased the respective, identical, LTC Policies from John Hancock in 2004.

120.    John Hancock issued the respective LTC Policies to the Feldheims.

121.    The LTC Policies' terms provided that any caregivers providing long-term care to the Feldheims at home were required to hold various certifications or qualifications in order to be paid under the LTC Policies for rendering such care.

122.    Caring Connections falsely represented to John Hancock by way of false invoices and logs that its employees were providing caretaking services to the Feldheims between

23

December 2018 for Mrs. Feldheim and February 2019 for Mr. Feldheim, and continuing until mid-July 2024. Specifically, multiple invoices contained the following false statements: (a) the word "Provider:" followed by "Caring Connections LLC," falsely representing that Caring Connections was the entity providing the caregiving services; (b) "COMPANION CARE SERVICE" followed by a date range and daily rate, falsely representing that Caring Connections was billing for services it had rendered; and (c) "Bill To [Vera Blimy Feldheim/Arthur Feldheim]," falsely implying a service relationship between Caring Connections and the Feldheims for caregiving services that Caring Connections was not, in fact, providing. *See e.g.*, **Exhibits 5, 6, 8, 9, 10 and 12**.

123.    Caring Connections submitted these false invoices and logs, which bore its company logo, to John Hancock via facsimile or online portal on a biweekly basis beginning no later than in December 2018 for Mrs. Feldheim and in February 2019 for Mr. Feldheim, and lasting until mid-July 2024. Each biweekly submission was a separate act of fraud.

124.    The invoices submitted by Caring Connections from no later than in December 2018 for Mrs. Feldheim and in February 2019 for Mr. Feldheim through mid-July 2024 regularly contained, *inter alia*, the following specific material misrepresentations: (a) the designation "Provider: Caring Connections LLC," which falsely represented that Caring Connections was the entity providing caregiving services when it was not; (b) the statement "Were the care services performed at home? Yes," which falsely represented that services were performed at the Feldheims' New Jersey residence when the Feldheims were frequently in Florida; (c) Weekly Documentation Logs bearing caregiver signatures—often photocopies with altered dates—above language stating "By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan" and "I also know that if I provide information on this form that I know is false, I will face termination of my employment," which

24

falsely represented that the signatory was a Caring Connections employee confirming Caring Connections' services; (d) billing entries for "COMPANION CARE SERVICE" at daily rates of $480 to $645, which falsely represented that Caring Connections was billing for services it had performed; and (e) a fraud attestation acknowledging criminal penalties for false submissions, which Caring Connections disregarded.

125.    In addition, in January 2024, Caring Connections executed updated Service Agreements with each of the Feldheims in which it falsely represented that it would be providing them with caregiving services, with knowledge both that: (1) John Hancock would rely on the Service Agreements in continuing to pay the Feldheims' reimbursement benefits under their respective LTC Policies; and (2) that Caring Connections would not actually perform any such caregiving services for the Feldheims, which it had not done for Mrs. Feldheim since November 2018 and had never done for Mr. Feldheim.

126.    Notwithstanding, after November 2018, with respect to the Feldheims, Caring Connections provided no caregivers, compensated no caregivers, supervised no care, and maintained no records.

127.    Caring Connections was, however, receiving monthly payments from the Feldheims for submission of the false invoices and logs on its letterhead.

128.    The foregoing statements were present material misrepresentations of fact because they determined whether or not the Feldheims would continue to receive, and be able to substantiate, the reimbursement benefits they were being paid under the LTC Policies, and because they determined whether Caring Connections would continue to receive payments for the "home health services" it was "providing" to the Feldheims.

25

129.    The foregoing statements were collateral to the insurance contracts between Mrs. Feldheim and John Hancock and Mr. Feldheim and John Hancock, respectively, because the aforementioned invoices and logs were not part of the LTC Policies, but rather were third-party documents used to induce continued payments.

130.    Caring Connections knew that its representations to John Hancock were false. As a licensed home health agency, based in New York and licensed in New Jersey, with knowledge of home health care regulations, Caring Connections knew that it was representing itself as the "Provider" of services to John Hancock while not actually providing any caregivers. Caring Connections also knew that services performed by the Feldheims' unidentified, unapproved caregivers were excluded from coverage because: (a) Caring Connections has admitted that it has no record of any contact with the Feldheims' actual caregivers; (b) Caring Connections has admitted that it has no information about the Feldheims' actual caregivers or their qualifications; (c) Caring Connections cannot identify or explain the signatures on the weekly logs it submitted to John Hancock; (d) Caring Connections has confirmed that at least four of the Feldheims' known, longtime caregivers over the past three years are not, and never were, employees of Caring Connections; and (e) Caring Connections' own internal records contain no documentation of caregiver assignments, nurse visits, care plans, or any communications with the Feldheims regarding their health needs—records that any legitimate home health agency would maintain for patients to whom it was actually providing services.

131.    Caring Connections also knew that its representations to John Hancock were false because it knew, from first-hand knowledge, that it did not provide any home health care services to the Feldheims from December 2018 onward. Yet Caring Connections continued to submit invoices on its own letterhead, identifying itself as "Provider," and attaching Weekly

26

Documentation Logs bearing its logo with language indicating that the caregiver was employed by Caring Connections—all of which representations Caring Connections knew to be false.

132.    Notwithstanding, Caring Connections made the misstatements to John Hancock to induce its reliance in the form of John Hancock's issuance of continued benefit payments to the Feldheims to then receive kickbacks totaling $364,496.58 from the Feldheims.

133.    Caring Connections' scienter is further evidenced by its immediate self-termination from its arrangement with the Feldheims on or about August 5, 2024, upon John Hancock's demand for proof-of-payment records and documentation that Caring Connections was unable to provide since it had not performed any services for the Feldheims since November 2018; except to actively participate with them in their routine and regularized commission of long-term care insurance fraud. Rather than cooperate with John Hancock's investigation or provide records demonstrating legitimate services, Caring Connections terminated its relationship with the Feldheims—conduct consistent with consciousness of guilt.

134.    Caring Connections owed John Hancock an independent duty as a licensed home health agency under New Jersey regulatory law, including N.J.A.C. 8:42-1, *et seq.*, to maintain accurate records and not misrepresent services rendered.

135.    John Hancock's reliance upon Caring Connections' statements was justifiable because Caring Connections, a licensed home health care agency, was submitting all of the care invoices to John Hancock as if those invoices reflected services performed by their own, licensed, certified employees. Therefore, until investigating the matter, John Hancock had no reason not to rely upon the accuracy of Caring Connections' statements.

136.    Because of John Hancock's reliance upon Caring Connections' knowing and deliberate misrepresentations to John Hancock, Caring Connections was paid not less than $364,496.58 that it should not have received, exclusive of costs and interest.

137.    Caring Connections has refused to return the fraudulently obtained $364,496.58, notwithstanding John Hancock's demand.

AS AND FOR A FOURTH CAUSE OF ACTION
(Aiding And Abetting Fraud - Against Caring Connections LLC)

138.    John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

139.    Mr. and Mrs. Feldheim, as the insureds and claimants under the LTC Policies, committed long-term care insurance fraud as described in Paragraphs 78 through 111 above, by: (a) directing Caring Connections to submit biweekly invoices falsely listing Caring Connections as "Provider" when Caring Connections was not providing any caregivers; (b) attaching Weekly Documentation Logs with caregiver signatures—often photocopied with altered dates or missing entirely—purporting to verify services rendered by Caring Connections employees; (c) affirming via online portal that services were "performed at home" in New Jersey when the Feldheims were in Florida; (d) signing fraud acknowledgments warning that false submissions constitute insurance fraud; and (e) paying Caring Connections over $2,400 per month to submit these false invoices on the Feldheims' behalf, despite knowing that Caring Connections was not providing any caregivers.

140.    As a consequence of that fraudulent conduct, Mr. and Mrs. Feldheim received payments from John Hancock totaling approximately $1,278,337.51 that they otherwise would not have received, and Caring Connections received $364,496.58 that it otherwise would not have received.

28

141. Caring Connections, or its members, officers, directors, agents, servants, or representatives, had actual knowledge that it was not providing caregiving services to the Feldheims after November 2018.

142. Caring Connections, or its members, officers, directors, agents, servants, or representatives, had actual knowledge of the terms of the LTC Policies and their exclusions because: (a) Caring Connections had multiple clients insured by John Hancock and signed John Hancock Home Health Care Forms acknowledging that submitting false claims constitutes insurance fraud; (b) as a licensed home health care agency, Caring Connections was required to understand the regulatory requirements for providing home health care services; and (c) the invoices Caring Connections submitted on the Feldheims' behalf were prepared on Caring Connections' own letterhead, using Caring Connections' own invoice templates, stating that Caring Connections was the "Provider" of services—representations that Caring Connections knew to be false because it knew it was not providing any caregivers to the Feldheims.

143. Caring Connections, through its members, officers, directors, agents, servants, or representatives, had actual knowledge that the Feldheims were making material misrepresentations to fraudulently obtain payments under the LTC Policies.

144. Caring Connections, through its members, officers, directors, agents, servants, or representatives, powers-of-attorney, conservators, or personal representatives, substantially assisted the Feldheims by actively assisting them in preparing, executing, and submitting false time logs and invoices to John Hancock for services purportedly rendered by Caring Connections that were actually rendered, if at all, by unknown and unapproved persons unaffiliated with Caring Connections.

29

145.    Caring Connections, through its members, officers, directors, agents, servants, or representatives, powers-of-attorney, conservators, or personal representatives, substantially assisted the Feldheims' fraud by: (a) submitting invoices under its name as "Provider" for services it knew it was not providing; (b) processing Weekly Documentation Logs without verifying the signatories or whether services were actually rendered; (c) holding itself out as a licensed home health care agency while allowing unlicensed, unidentified individuals to provide care; and (d) accepting $364,496.58 in administrative fees in exchange for lending the legitimacy of its agency license to the Feldheims' fraudulent claims. This arrangement was, by Caring Connections' own admission, unique among all of its clients.

146.    That substantial assistance included submitting the completed invoices and Weekly Documentation Logs on its company letterhead for payment directly to John Hancock under the auspices of Caring Connections, a licensed home health care provider, rather than from the Feldheims, despite knowing that the logs bore signatures that Caring Connections could not identify or verify, bore photocopied signatures with altered dates, and in some instances after 2022, bore no caregiver signature at all.

AS AND FOR A FIFTH CAUSE OF ACTION
(Violation of the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 et seq. –
Against All Defendants)

147.    John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

148.    The New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 *et seq.*, prohibits any person from presenting, or causing to be presented, any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy,

30

knowing that the statement contains false or misleading information concerning any fact or thing material to the claim. N.J.S.A. 17:33A-4(a).

149.    The IFPA further prohibits any person from assisting, conspiring with, or urging any person to violate any provision of the Act. N.J.S.A. 17:33A-4(b).

150.    The IFPA provides that an insurer damaged as the result of a violation of its provisions may bring a civil action to recover compensatory damages, treble damages for each violation, the costs of investigation, and reasonable attorneys' fees. N.J.S.A. 17:33A-7.

151.    The LTC Policies issued by John Hancock to Mr. Feldheim and Mrs. Feldheim are "insurance policies" within the meaning of the IFPA.

152.    John Hancock is an insurer authorized to transact business in the State of New Jersey within the meaning of the IFPA. N.J.S.A. 17:33A-3.

153.    All Defendants are "persons" within the meaning of the IFPA, N.J.S.A. 17:33A-3, and are subject to its prohibitions and penalties.

154.    As set forth above, from no later than December 2018 through mid-July 2024, Defendants knowingly made, and caused to be made, false and misleading statements of material fact in documents submitted to John Hancock in support of claims for payment under the LTC Policies, in violation of N.J.S.A. 17:33A-4.

155.    Specifically, the Feldheims directed and authorized Caring Connections to submit biweekly invoices and Weekly Documentation Logs to John Hancock, each containing the following false statements material to the Feldheims' claims: (a) the designation "Provider: Caring Connections LLC," falsely representing that Caring Connections was providing caregiving services to the Feldheims when it was not; (b) billing entries for "COMPANION CARE SERVICE" at daily rates of $480 to $645, falsely representing that Caring Connections was billing

31

for services it had performed; (c) the representation that care services were "performed at home" in Lakewood, New Jersey, when the Feldheims were frequently in Miami, Florida; and (d) Weekly Documentation Logs bearing caregiver signatures above language stating that the signatory was confirming services "performed in accordance with the care plan" as an employee of Caring Connections, when the actual caregivers were not employed by or affiliated with Caring Connections.

156.    The Feldheims knew that the foregoing statements were false when presented because: (a) Mr. Feldheim has admitted that the caregivers are not United States citizens and are not legally residing in the United States, and therefore could not have held the professional licenses or certifications required under the LTC Policies; (b) the Feldheims directly hired and paid their unapproved caregivers in cash without any involvement from Caring Connections; (c) the Feldheims were physically present in Miami, Florida for approximately three months each year while invoices falsely represented that services were being rendered in Lakewood, New Jersey; and (d) the Feldheims signed fraud acknowledgments in their Claim Initiation Forms warning that submission of false or deceptive statements constitutes insurance fraud.

157.    From no later than December 2018 for Mrs. Feldheim and February 2019 for Mr. Feldheim, and continuing through mid-July 2024, Caring Connections presented written statements to John Hancock in support of the Feldheims' claims for reimbursement benefits under the LTC Policies, knowing that those statements contained false and misleading information material to the claims, in violation of N.J.S.A. 17:33A-4(a).

158.    Specifically, Caring Connections prepared and submitted on its company letterhead, via facsimile or online portal, biweekly invoices and Weekly Documentation Logs falsely representing that Caring Connections was the "Provider" of home health care services to

32

the Feldheims; that it was billing the Feldheims for caregiving services it had rendered; and that the caregivers reflected on the Weekly Documentation Logs were employed by Caring Connections—all of which representations Caring Connections knew to be false because it was not providing any caregivers to the Feldheims and had not done so since November 2018 for Mrs. Feldheim and had never done so for Mr. Feldheim.

159.    Caring Connections knew the foregoing statements were false because: (a) Caring Connections has admitted that it has no record of any contact with the Feldheims' actual caregivers; (b) Caring Connections has admitted that it has no information about the Feldheims' actual caregivers or their qualifications; (c) Caring Connections cannot identify or explain the signatures on the Weekly Documentation Logs it submitted to John Hancock; (d) Caring Connections has confirmed that at least four of the Feldheims' known, longtime caregivers over the past three years are not, and never were, employees of Caring Connections; and (e) Caring Connections' own internal records contain no documentation of caregiver assignments, nurse visits, care plans, or any communications with the Feldheims regarding their health care needs.

160.    In addition, each time Caring Connections submitted invoices to John Hancock via online portal on behalf of the Feldheims, Caring Connections acknowledged that "an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties." Caring Connections disregarded this warning on each occasion.

161.    Caring Connections further violated the IFPA by assisting, conspiring with, and/or urging the Feldheims to violate the Act, in violation of N.J.S.A. 17:33A-4(b), by: (a) agreeing to create and submit false invoices on its letterhead to John Hancock in exchange for monthly

33

payments of at least $2,448.80 per Feldheim; (b) lending the legitimacy of its license as a home health care agency to the Feldheims' fraudulent claims; (c) executing updated Service Agreements in January 2024 falsely representing that it would provide caregiving services to the Feldheims, with knowledge that John Hancock would rely on the existence of those agreements in continuing to pay reimbursement benefits; and (d) processing and submitting Weekly Documentation Logs without verifying the identity of the signatories or whether services were actually rendered by Caring Connections employees.

162.    The false statements and submissions made by Defendants were material to John Hancock's decisions to continue authorizing and paying benefits under the LTC Policies. Had John Hancock known the truth — that Caring Connections was not providing any caregiving services to the Feldheims, that the caregivers were unlicensed undocumented individuals unapproved by John Hancock, and that the Feldheims were absent from their New Jersey residence for substantial portions of each year — John Hancock would not have continued to make benefit payments under the LTC Policies.

163.    Each biweekly submission to John Hancock by Caring Connections on behalf of the Feldheims constitutes a separate and discrete violation of N.J.S.A. 17:33A-4.

164.    As a direct and proximate result of Defendants' violations of the IFPA, John Hancock has been damaged in an amount not less than $1,278,337.51, representing the total of all benefit payments made to the Feldheims under the LTC Policies from December 2018 through mid-July 2024, exclusive of interest and costs.

165.    Defendants' violations of the IFPA constitute a pattern of violations within the meaning of N.J.S.A. 17:33A-7(a) in that Defendants submitted false statements to John Hancock

on a biweekly basis over a period of more than five years, resulting in hundreds of separate false submissions per insured.

166.    Pursuant to N.J.S.A. 17:33A-7(a), John Hancock is entitled to recover treble damages based upon Defendants' pattern of violations.

167.    Pursuant to N.J.S.A. 17:33A-7(a), John Hancock is also entitled to recover its reasonable costs of investigation, reasonable attorneys' fees, and interest.

WHEREFORE, Plaintiff demands judgment from Defendants as follows:

(a) On the First Cause of Action, in favor of Plaintiff John Hancock and against Defendants Mr. and Mrs. Feldheim in an amount to be determined at trial, but in no event less than $1,278,337.51;

(b) On the Second Cause of Action, in favor of Plaintiff John Hancock, and against Defendants Mr. and Mrs. Feldheim, in an amount to be determined at trial, but in no event less than $1,278,337.51;

(c) On the Third Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Caring Connections, in an amount to be determined at trial, but in no event less than approximately $364,496.58;

(d) On the Fourth Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Caring Connections, in an amount to be determined at trial, but in no event less than approximately $1,278,337.51;

(e) On the Fifth Cause of Action, in favor of Plaintiff John Hancock, and against all Defendants, jointly and severally, for compensatory damages in an amount not less than $1,278,337.51, treble damages pursuant to N.J.S.A. 17:33A-7(b) for each violation of the New Jersey Insurance Fraud Prevention Act, together with John Hancock's costs of investigation, reasonable attorneys' fees, pre-judgment and post-judgment interest, and such other and further relief as the Court deems just and proper.

(f) For Plaintiff John Hancock's costs and disbursements in this action, including its reasonable attorneys' fees;

(g) Pre-judgment and post-judgment interest; and

(h) For such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff John Hancock Life & Health Insurance Company hereby demands trial by jury as to all issues herein presented.

SICHENZIA ROSS FERENCE CARMEL LLP

By:    /s/ *Owen A. Kloter*
Owen A. Kloter, Esq., Attorney ID: #03462-2010
A.R. John Hitchings, *pro hac vice*
1185 Avenue of the Americas, 26th Floor
New York, New York 10036
Telephone: (212) 930-9700
E-mail: okloter@srfc.law

*Attorneys for Plaintiff*
*John Hancock Life & Health Insurance Company*

Dated: June 11, 2026

36

# EXHIBIT 1



# Your Long-Term Care Insurance Policy

LTC-3349F 1/09
REV. 9/16

**John Hancock Life Insurance Company, Boston, MA 02205**

# Individual Long-Term Care Insurance

## Custom Care
## New York



**If you have any questions, please call
LTC Support Services toll-free at
1-800-543-6415**

**State: New York**

**2002**

**John Hancock Life Insurance Company**
**Boston, Massachusetts**

*John Hancock*

We at John Hancock are pleased to provide You with this Policy and the important benefits that it provides.

**THIRTY DAY FREE LOOK.** If You are not completely satisfied with this Policy for any reason, You may return it within 30 days from the date it was delivered to You. To return the Policy, mail or deliver the Policy to Our LTC Administrative Office. We will then refund any premium paid, and the Policy will be treated as if it had never been issued.

**PLEASE READ THIS POLICY CAREFULLY.** This Policy is a legal contract between You and Us. We will provide the benefits stated in this Policy subject to the provisions, exceptions and limitations stated on this and the following pages. We have issued this Policy in consideration of the application and payment of the First Premium on or before the date this Policy is delivered to You.

**CAUTION.** The issuance of this long-term care insurance Policy is based upon Your responses to the questions on Your application. A copy of Your application is attached. If Your answers are not complete, true, and correctly recorded, or if You fail to include all material medical information requested, We have the right to deny benefits or rescind Your Policy subject to the Time Limit on Certain Defenses provision. The best time to clear up any questions is now, before a claim arises! To contact Us at Our LTC Administrative Office, write to: John Hancock Life Insurance Company, PO Box 55978, Boston, MA 02205 or call Us at 1-800-377-7311.

**NOTICE TO BUYER.** This Policy may not cover all of the costs associated with long-term care You incur during the period of coverage. You are advised to review all Policy limitations carefully. THIS IS NOT A MEDICARE SUPPLEMENT POLICY.

**GUARANTEED RENEWABLE FOR LIFE OR UNTIL THE POLICY LIMIT IS REACHED — LIMITED RIGHT TO INCREASE PREMIUMS.** As long as You pay the required premium, You have the right to continue this Policy for as long as You live or until the Policy Limit is reached. We cannot cancel the Policy unless You do not make the required premium payments on a timely basis. To continue this Policy, You must make sure that You pay the premiums when they are due. We reserve the right to increase Your premium as of any premium due date; however, any changes in premium rates must apply to all similar policies issued in Your state on this Policy form and be approved by the Superintendent of Insurance of the State of New York. This means We cannot single You out for an increase because of any change in Your age or health. In addition, We cannot change the provisions of this Policy without Your consent.

**FEDERAL INCOME TAX TREATMENT OF THIS POLICY.** Long-term care insurance was granted favorable federal income tax treatment in the Health Insurance Portability and Accountability Act of 1996. Policies meeting certain criteria outlined in this Act are eligible for this treatment. To the best of Our knowledge, We have designed this Policy to meet the requirements of this law. This Policy is intended to be a qualified long-term care contract under Section 7702B(b) of the Internal Revenue Code. If, in the future, it is determined that this Policy does not meet these requirements, We will make every reasonable effort to amend the Policy if We are required to do so in order to gain such favorable federal income tax treatment. We will offer You an opportunity to receive these amendments.

Signed for the Company at Boston, Massachusetts:

Secretary                                                                                         President

**LONG-TERM CARE INSURANCE POLICY**
**The benefit schedule and the amount of Your First Premium are shown in the Policy Schedule.**

LTC-02 NY                                                  1

# TABLE OF CONTENTS

**SCHEDULE OF BENEFITS** ........................................................................................... 3

**PART 1    WORDS AND PHRASES** ........................................................................ 5

**PART 2    YOUR LONG-TERM CARE BENEFITS** ................................................ 11
    Eligibility for the Payment of Benefits
    Conditions
    Limitations
    Charges Not Covered
    What are Core Benefits and Alternative Benefits?
    What Happens to the Policy Limit if You Use Core Benefits and/or Alternative Benefits?
    Long-Term Care Benefit
    Stay At Home Benefit
    Respite Care Benefit
    Care Advisory Services Benefit
    Waiver of Premium Benefit
    Extension of Benefits
    International Coverage Benefit

**PART 3    EXCEPTIONS** .......................................................................................... 17
    Exceptions
    Non-Duplication of Benefits

**PART 4    CLAIMS** ................................................................................................... 18
    Notice of Claim
    Claim Forms and Proof of Loss
    Our Claims Evaluation Process
    Time of Payment of Claims
    Payment of Claims
    Misstatement of Age
    Appeals
    Legal Action

**PART 5    PREMIUMS AND REINSTATEMENT** ...................................................... 22
    Payment of Premiums
    Grace Period
    Reinstatement
    Added Protection Against Lapse
    Refund of Unearned Premiums at Death

**PART 6    GENERAL PROVISIONS** ......................................................................... 24
    Entire Contract and Changes
    Time Limit on Certain Defenses/Misrepresentation
    Conformity with State Laws
    Right to Recovery
    Suspended Coverage During Military Service
    Policy Termination

LTC-02 NY

| | | | |
|---|---|---|---|
| **Insured:** | Blime Feldheim | **Effective Date of Coverage:** | March 5, 2004 |
| **Policy Number:** | ▮▮▮▮▮ | **First Monthly Premium: *** | $335.34 |
| **Policy Form:** | LTC-02 NY | | |
| **Policy Title:** | Long-Term Care Insurance Policy | | |

## POLICY SCHEDULE

This Policy Schedule provides You with specific information about the benefits You selected and how much We will pay.

**Coverage Limits:**

| | |
|---|---|
| **Elimination Period:** | 90 Dates of Service |
| **Benefit Period:** | Lifetime |
| **Long-Term Care Benefit Amount*:** | $15,930.00 per month |
| **Stay At Home Lifetime Benefit Amount*:** | $15,930.00 |
| **Respite Care Benefit Amount*:** | $531.00 per day |
| **Care Advisory Services Benefit Amount*:** | $5,310.00 per calendar year |
| **International Coverage Benefit Amount*:** | $11,947.50 per month |

*Subject to increases due to inflation coverage, if any.

**2.7% Simple Inflation Coverage**

**Base Policy Premium:**                           $3,726.00 Annual Premium

**Total Premium Payment Options (includes all optional benefits):**

| | Annual | Semi-Annual | Quarterly | Monthly |
|---|---|---|---|---|
| First Year Premium: | $3,726.00 | $1,937.52 | $1,006.02 | $335.34 |
| Total Yearly Cost for First Year Premium: | $3,726.00 | $3,875.04 | $4,024.08 | $4,024.08 |

*If You would like additional information about the costs of our periodic payment, please contact Us at 1-800-377-7311.*

*Early notification to Our Claims Department will facilitate a timely review of Your claim. Please let Us know immediately or in advance, whenever possible, when You need care or services covered by this Policy. Please call Us at 1-800-377-7311.*

This Policy has been issued with a Marital Discount.
Policy is on Waiver of Premium

This Schedule replaces any prior Schedule as of 11/05/2024.

LTC-02 NY                           3

*This page was intentionally left blank*.

LTC-02 NY                                    4

## PART 1 - WORDS AND PHRASES

**This part explains the special meaning given to certain words or phrases as they are used in this Policy.  Other terms may be defined in the part in which they are most frequently used. Defined terms are presented with capital letters to help You easily identify them.**

**We urge You to pay special attention to facility and care provider definitions. The terms used in this Policy are Our way of referencing the collection of information contained in the definition.**

**Activities of Daily Living** means the following activities:

- *Bathing* which means washing Yourself by sponge bath; or in either a tub or shower, including the task of getting into or out of the tub or shower.
- *Continence* which means the ability to maintain control of bowel and bladder functions; or when unable to maintain control of bowel or bladder functions, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).
- *Dressing* which means putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.
- *Eating* which means feeding Yourself by getting food into the body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.  Eating does not include preparing a meal.
- *Toileting* which means getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.
- *Transferring* which means moving into or out of a bed, chair or wheelchair.  Transferring does not include the task of getting into or out of the tub or shower.

**Adult Day Care** means social and health-related services provided during the day in a community or group setting to six (6) or more persons. The purpose of the program is to support frail or impaired elderly, or other disabled adults who can benefit from care in a group setting outside the home.

**Adult Day Care Center** means a place that is licensed to provide Adult Day Care by the jurisdiction in which the services are provided. If licensing is not required, Adult Day Care Center means a place that provides Adult Day Care, has enough full-time staff to maintain no more than an 8 to 1 client-staff ratio, and has established procedures for obtaining appropriate aid in the event of a medical emergency.  An Adult Day Care Center is a place that provides Adult Day Care for only part of a day.

**Assisted Living Facility** means a facility which:

- is licensed to provide Custodial Care according to the laws of the jurisdiction in which it is located; or
- if licensing is not required, meets all of the following  --
    - has a 24-hour on-site staff to provide Custodial Care;
    - provides Custodial Care services for a charge, including room and board;
    - has established procedures for obtaining appropriate aid in the event of a medical emergency;
    - provides 3 meals a day and can accommodate special dietary needs; and
    - provides Custodial Care services to 10 or more persons.

LTC-02 NY                                                5

Examples of such facilities may include Alzheimer facilities or Assisted Living Facilities that are either free standing facilities or part of a life-care community. They may also be met by some personal care and adult congregate care facilities.

An Assisted Living Facility does not mean:

- a hospital or clinic;
- a rest home (a home for the aged or a retirement home) which does not, as its primary function, provide Custodial Care;
- Your Home; or
- a facility for the treatment of alcoholism, drug addiction, or mental illness.

**Care Advisory Services** means assessment and care planning by a Home Health Agency, a Care Management Organization or an Independent Care Manager.  Care Advisory Services do not determine eligibility for benefits under this Policy.  Care Advisory Services include:

- assessing Your need for long-term care services;
- developing a recommendation for long-term care services that is consistent with Your care needs based upon their assessment;
- coordinating delivery of long-term care and services; and
- monitoring the long-term care and services delivered.

**Care Management Organization** means an organization which is licensed, if required, and operated to provide Care Advisory Services according to the laws, if any, of the jurisdiction in which it is located.  If licensing is not required, a Care Management Organization means an organization that provides Care Advisory Services and meets all the following requirements:

- has a full-time administrator;
- maintains records of services provided to each client; and
- has a staff including at least one full-time registered nurse, one full-time licensed social worker, one full-time individual who holds the designation of a 'Care Manager' from the National Association of Professional Care Managers,  or a full-time person with a Masters in Gerontology from an accredited school of Gerontology.

**Cognitive Impairment** means a deficiency in a person's short-term or long-term memory; orientation as to person, place, or time; deductive or abstract reasoning; or judgment as it relates to safety awareness.  Your Cognitive Impairment must be established and reliably measured by clinical evidence and standardized tests. The need for Substantial Supervision due to the presence of Cognitive Impairment must be established by such clinical evidence and standardized tests.

**Custodial Care** means non-skilled long-term care included in Your Plan of Care and approved by a Licensed Health Care Practitioner: which is necessary due to Your Cognitive Impairment; or to assist You in the Activities of Daily Living.

**Date of Service** means a day that You are eligible for benefits under this Policy (including Dates of Service during the Elimination Period)  on which You:

- are a resident in a Nursing Home or an Assisted Living Facility;
- receive Home Health Care or Hospice Care; or
- receive services covered under this Policy that are Medicare eligible (for which benefits are not payable under this Policy).

**Elimination Period** (waiting period) means the number of Dates of Service that would otherwise be covered by this Policy, for which We will not pay benefits. The Elimination Period is shown in the Policy Schedule. Only one complete Elimination Period needs to be satisfied while Your Policy is in force.

The Elimination Period starts on the first Date of Service.  No Date of Service may be counted as more than one day towards the satisfaction of Your Elimination Period. The Dates of Service used to satisfy Your Elimination Period do not need to be consecutive and may be accumulated under separate claims.  We will not pay benefits for charges during the Elimination Period, except for Care Advisory Services, Respite Care and the Stay at Home Benefit. Days that You only receive Respite Care will not count toward the satisfaction of Your Elimination Period.

If You receive Home Health Care for one or more days in a Calendar Week, We will apply seven days toward the satisfaction of Your Elimination Period, except if Respite Care is being received during the Calendar Week. If Respite Care is received during a Calendar Week, only the actual Dates of Service other than Respite Care will be applied toward satisfaction of Your Elimination Period. Please note that there will be no credit of days which occur before Your first Date of Service. (Calendar Week means the seven consecutive day period that begins on Sunday at 12:01 a.m.)

**Home** means Your primary residence including Your living quarters in a continuing care retirement community or similar entity.  It does not include a Nursing Home, an Assisted Living Facility, an Alzheimer's facility, an Adult Day Care Center, a rest home, a hospital or rehabilitation facility/hospital, or a facility for the treatment of alcoholism, drug addiction or mental illness.

**Home Health Care** means medical and non-medical professional or personal care services provided in Your Home. These services must be provided by a Home Health Care Provider. Home Health Care includes those services required by the laws and regulations of the jurisdiction in which they are provided.

Home Health Care includes homemaker services.  Homemaker services mean non-medical support services provided by a Home Health Agency.  These services include meal preparation, shopping, laundry and house cleaning.

**Home Health Care Provider** means either a Home Health Agency or an Independent Home Health Care Provider that provides Home Health Care.  A Home Health Care Provider cannot be a member of Your Immediate Family except as provided in the "Exceptions" section of the Policy.

- A Home Health Agency must meet one of the following requirements:
  - it is licensed as a Home Health Agency by the jurisdiction in which the Home Health Care is provided; or
  - it possesses one of the following certifications in the jurisdiction in which the Home Health Care is provided - Medicare Certification; Joint Commission of Accreditation of Health Care Organizations (JCAHO) Certification; or Community Health Accreditation Program (CHAP) Certification; or

LTC-02 NY

- it provides Home Health Care through 2 or more employees of an organization that is in the business of providing Home Health Care according to the laws of the jurisdiction in which it is located.

- An Independent Home Health Care Provider means a care provider not employed by a Home Health Agency who meets one of the following requirements.  He or she:
  - is a duly licensed registered nurse, licensed vocational nurse, licensed practical nurse, physical therapist, occupational therapist, speech therapist, respiratory therapist, licensed social worker, or registered dietitian;
  - must be currently qualified as a certified home health aide or certified nurse aide; or
  - must be currently included in a government sponsored nurse aide registry.

- In the case of a home health aide or nurse aide who does not meet one of the standards set forth above, such aide must present written proof of completion of an established training course which must include training in safely assisting persons with the Activities of Daily Living.

**Hospice Care** means a program for meeting Your care needs if You are Terminally Ill.  Terminally Ill means there is no reasonable prospect of cure and You have a life expectancy, as estimated by a Physician, of 12 months or less.  Hospice Care must be provided by an organization that is licensed to provide such care according to the laws of the jurisdiction in which it is located.  Hospice Care is limited to those services received by You. You must satisfy Your Elimination Period before receiving benefits for Hospice Services. Hospice Care may be provided in Your Home, a Nursing Home, an Assisted Living Facility, and Adult Day Care Center or in a Hospice Care facility.

**Immediate Family** means Your spouse, or the following relatives of You or Your spouse:  parents, grandparents, siblings, children, stepchildren, grandchildren, and their respective spouses.

**Independent Care Manager** means:

- a registered nurse;
- a licensed social worker;
- an individual who holds the designation of a 'Care Manager' from the National Association of Professional Care Managers; or
- a person with a Masters degree in Gerontology (or equivalent) from an accredited school of Gerontology.

**Licensed Health Care Practitioner** means a Physician, a registered nurse (R.N.), a licensed social worker, or any other individual who meets the requirements as may be prescribed by the Secretary of the Treasury or as required by state law or regulation as appropriate. You may select any Licensed Health Care Practitioner of Your choosing.  However, a Licensed Health Practitioner may not be a member of Your Immediate Family.

**Long-Term Care Services** means the following covered care or services:

- confinement in a Nursing Home or Assisted Living Facility for room, board and care services (such care services being Nursing Care, Custodial Care and Hospice Care);
- Home Health Care, Hospice Care, Respite Care; or
- attendance at an Adult Day Care Center providing Adult Day Care.

**Medicaid** means the reimbursement system under Title XIX of the Federal Social Security Act, as amended.

LTC-02 NY    8

**Medicare** means the reimbursement system under Title XVIII of the Federal Social Security Act, as amended.

**Nursing Care** means skilled or intermediate care provided by one or more of the following health care professionals:  registered nurse, licensed vocational nurse, licensed practical nurse, physical therapist, occupational therapist, speech therapist, respiratory therapist, medical social worker, registered dietitian or person licensed or certified to provide such care.

**Nursing Home** means a facility which is licensed and operated to provide Nursing Care for a charge (including room and board), according to the laws of the jurisdiction in which it is located.  If licensing or certification is not required by the jurisdiction in which the Nursing Home is located, a Nursing Home means a facility which has services performed by or under the continual, direct and immediate supervision of a registered nurse, licensed practical nurse or licensed vocational nurse, on-site twenty-four (24) hours per day.

Services provided in a Nursing Home are covered to the extent required by the laws and regulations of the jurisdiction where the policy is delivered.

A Nursing Home may be a freestanding facility or it may be a distinct part of a facility, including a ward or a wing of a hospital or other facility.

Nursing Home does not mean:

- a hospital or clinic;
- a swing-bed in a hospital;
- a rest home (a home for the aged or a retirement home) which does not, as its primary function, provide Custodial Care;
- Your Home; or
- a facility for the treatment of alcoholism, drug addiction, or mental illness.

**Physician** means any person licensed as a Medical Doctor (M.D.) or Doctor of Osteopathy (D.O.) practicing within the scope of his or her license issued by the jurisdiction in which the services are rendered.

**Plan of Care** means a written plan for long-term care services designed especially for You.  This Plan of Care must specify the type, frequency and providers of all the services You require; and be in accordance with accepted medical and nursing standards of practice.  A Licensed Health Care Practitioner must approve Your Plan of Care.

**Policy Limit** means the total amount, as shown on the Policy Schedule, from which You will be paid benefits for all covered care and services.  All benefits, except for the Stay at Home Benefit and Care Advisory Services Benefit, will be deducted from the Policy Limit.  We will not pay benefits, except for the Stay at Home Benefit, in excess of the Policy Limit as shown in the Policy Schedule.

**Respite Care** is the short-term care designed to provide temporary relief to Your primary uncompensated caregiver from his or her caregiving duties and provided in: a Nursing Home; a Assisted Living Facility; an Adult Day Care Center; Your Home; or a community-based program. Respite Care includes: confinement in a Nursing Home or Assisted Living Facility; Home Health Care; Adult Day Care; and Hospice Services.

LTC-02 NY

**Substantial Assistance** means You need hands-on or standby assistance while You are performing an Activity of Daily Living.

- *Hands-on assistance* means the physical assistance of another person without which You would be unable to perform the Activity of Daily Living.
- *Standby assistance* means the presence of another person within arm's reach of You that is necessary to prevent, by physical intervention, injury to You while You are performing the Activity of Daily Living.

**Substantial Supervision** means You need continual supervision due to Your Cognitive Impairment (which may include cueing by verbal prompting, gestures, or other demonstration) by another person that is necessary to protect You from threats to Your health or safety (such as may result from wandering).

**We, Our and Us** means the John Hancock Life Insurance Company.

**You, Your** and **Yourself** means the person listed in the Policy Schedule as the Insured.

### PART 2 - YOUR LONG-TERM CARE BENEFITS

**This part describes when You are eligible for benefits, the benefits available under this Policy and the conditions under which benefits will be paid.**

### ELIGIBILITY FOR PAYMENT OF BENEFITS

**Eligibility for the Payment of Benefits**

You are eligible for benefits under this Policy if:

- You need Substantial Assistance to perform at least two of the Activities of Daily Living; or
- You require Substantial Supervision to protect Yourself from threats to health and safety due to the presence of a  Cognitive Impairment.

*Coverage is provided for Alzheimer's Disease and forms of senility and irreversible dementia that result in a Cognitive Impairment.*

### LIMITATIONS ON OR CONDITIONS FOR ELIGIBILITY FOR BENEFITS

**Conditions**

To receive benefits under this Policy:

- Your Elimination Period must have been satisfied unless otherwise provided in this Policy;
- You must receive covered care or services while this Policy is in effect or You qualify for Extension of Benefits;
- You must receive care or services that are consistent with Your care needs and are covered under this Policy, specified in a Plan of Care and are in accordance with accepted medical and nursing standards of practice; and
- You must submit to Us a current Plan of Care and written Proof of Loss that is acceptable to Us.

Because this Policy is intended to be tax-qualified under federal law, You must ALSO provide Us with one of the following written certifications:

- A Licensed Health Care Practitioner must certify that You are unable to perform without Substantial Assistance from another individual at least two Activities of Daily Living due to the loss of functional capacity for a period expected to last at least 90 days.
- A Licensed Health Care Practitioner must certify that You require Substantial Supervision to protect Yourself from threats to health and safety due to the presence of a Cognitive Impairment.

This written certification must be renewed and submitted to Us every 12 months.

**Limitations**

We will not pay benefits, except for the Stay at Home Benefit and Care Advisory Services Benefit, in excess of the Policy Limit as shown in the Policy Schedule.  We will not pay benefits for charges during the Elimination Period, except as described in the Respite Care Benefit, Care Advisory Services Benefit and the Stay at Home Benefit.

LTC-02 NY                                          11

**Charges Not Covered**

We will not pay for any of the following:  Physician's charges; hospital and laboratory charges; prescription or non-prescription medication; medical supplies; durable medical equipment (except as described in the Stay at Home Benefit); transportation; items and services furnished at Your request for beautification, comfort, convenience or entertainment; and charges for care or services which are inconsistent with Your Plan of Care.

## CORE BENEFITS AND ALTERNATIVE BENEFITS

**What are Core Benefits and Alternative Benefits?**

Core Benefits are those benefits required to be provided in a Long-Term Care Insurance Policy by New York Regulation 62.  Those benefits are care in a Nursing Home and Home Health Care.

Alternative Benefits are those that are provided in this policy in addition to the Core Benefits.  They are: care in an Assisted Living Facility; Respite Care; Hospice Care; Adult Day Care, Care Advisory Services and Stay at Home Benefits.

**What Happens to the Policy Limit if You Use Core Benefits and/or Alternative Benefits?**

The Policy Limit applies to both the Core Benefits and the Alternative Benefits.  If You use the Alternative Benefits, it will decrease the amount remaining for Core Benefits.  You do not have to use the Alternative Benefits if You want to keep the Policy Limits for the Core Benefits only.  You have the right to choose whether or not to use the Policy Limit to pay for the Alternative Benefits.  If You do not want to use the Policy Limit to pay for the Alternative Benefits, do not file a claim for them.

## HOW YOUR LONG-TERM CARE BENEFITS ARE PAID

**Long-Term Care Benefit**

We will pay the actual charges incurred by You for Long-Term Care Services up to the Long-Term Care Benefit Amount as shown in the Policy Schedule if You are eligible for the payment of benefits under this Policy.

Long-Term Care Services mean the following covered care or services:

- confinement in a Nursing Home or Assisted Living Facility for room, board and care services (such care services being Nursing Care, Custodial Care and Hospice Care);
- Home Health Care, Hospice Care, Respite Care; or
- attendance at an Adult Day Care Center providing Adult Day Care.

In addition, if Your stay in a Nursing Home or Assisted Living Facility is interrupted for any reason and a benefit is payable under this Policy, We will continue to pay the actual charges for up to 60-days in any calendar year in order to reserve Your bed during Your absence.

Any unused portion of Your Long-Term Care Benefit Amount will remain in the Policy Limit.  Any benefit paid under this provision will reduce Your Policy Limit.

Notwithstanding any provisions to the contrary, payment for benefits will conform to Section 52.12 of Regulation 62.

LTC-02 NY                                              12

**Stay at Home Benefit**

The Stay at Home Benefit can be used to pay for a variety of Your long-term care expenses while You are living in Your Home that are not otherwise covered under the Policy. Stay at Home Services include:

1.  Home Modifications;
2.  Emergency Medical Response Systems;
3.  Durable Medical Equipment;
4.  Caregiver Training;
5.  Home Safety Check; and
6.  Provider Care Check.

We will pay actual charges incurred for Stay at Home Services up to the Stay At Home Lifetime Benefit Amount so long as all of the following conditions are met:

- the care or services are consistent with Your care needs and are provided pursuant to a Plan of Care approved by a Licensed Health Care Practitioner; and
- You are eligible for the payment of benefits under this Policy.

The Stay At Home Lifetime Benefit Amount is shown on the Policy Schedule.  Any unused portion of this benefit amount may be used for future Stay at Home Services.  Benefits paid under the Stay at Home Benefit will not reduce the Policy Limit. You do not have to satisfy the Elimination Period to receive benefits under the Stay at Home Benefit.  The days for which You receive only the Stay at Home Benefit do not count toward the Elimination Period.  You may receive benefits under the Long-Term Care Benefit and/or Care Advisory Services Benefit while receiving benefits under the Stay at Home Benefit.

The Stay at Home Benefit will no longer be available to You on the earliest of the following dates: the date You terminate Your Policy; the date You exhaust Your Policy Limit; the date You exhaust Your Stay at Home Lifetime Benefit Amount; or the date Your Policy goes on nonforfeiture status.

***Stay at Home Services Defined:***

- *Home Modifications* mean modifications to Your Home that are primarily being made to improve Your ability to perform the Activities of Daily Living and allow You to live safely and independently in Your Home. Examples of Home Modifications include: installation of ramps for wheelchair access; installation of shower bars; widening doorways; and other similar accessibility modifications. Home Modification does not include: hot tubs, swimming pools, home repair or maintenance; or other modifications that may, other than incidentally, increase the value of Your Home.

- *Emergency Medical Response System* means a communication system that is: installed in Your Home; and used to call for assistance in the event of a medical emergency. It does not mean a home security system.

- *Durable Medical Equipment* means equipment that You rent or purchase which is designed to be used in Your Home to assist You in performing the Activities of Daily Living. Examples of Durable Medical Equipment include: walkers; hospital-style beds; crutches; and wheelchairs. Durable Medical Equipment does not include: prescription drugs; athletic equipment; equipment placed in Your body; or items commonly found in a household.

LTC-02 NY

13

- *Caregiver Training* means a training program which provides instruction to uncompensated informal caregivers in basic caregiving techniques which will allow You to remain in Your Home.  Such training is to help Your caregiver tend to Your specific long-term care needs. The informal caregiver may be a relative or someone chosen by You, but in no event will We pay for training provided to someone who will be paid to care for You.

- *Home Safety Check* means a written evaluation of Your Home, by a Home Health Agency or other qualified professional agency or individual acceptable to Us, in order to evaluate the safety of Your Home environment. Examples of items in the Home that may be evaluated include: cabinet and appliance height; furniture arrangement; doorway and hallway width; and the need for safety bars in the bathroom.

- *Provider Care Check* means an independent written evaluation of Your care providers and the care You are receiving, in order to confirm consistent delivery of care being provided to You as defined in Your Plan of Care.  This evaluation must be performed by a Home Health Agency or other qualified professional agency or individual acceptable to Us.

**Respite Care Benefit**

During Your Elimination Period, We will pay benefits for Respite Care if:

- Respite Care is received while this Policy is in effect;
- a Licensed Health Care Practitioner verifies in writing that You have met the eligibility requirements of this Policy;
- We are provided with written proof that Your uncompensated caregiver is taking a temporary leave of absence; and
- You are eligible for the payment of benefits under this Policy.

During Your Elimination Period, We will pay the actual charges incurred for Respite Care up to the Respite Care Benefit Amount per day for up to 21-days in any calendar year. The Respite Care Benefit Amount available during the Elimination Period is shown in the Policy Schedule. This means You do not need to satisfy Your Elimination Period before receiving benefits for Respite Care.  Days that You receive Respite Care will not count toward the satisfaction of Your Elimination Period. Benefits paid for Respite Care during the Elimination Period, will reduce Your Policy Limit.

After Your Elimination Period has been satisfied, We will pay the actual charges incurred for Respite Care up to the Long-Term Care Benefit Amount as shown in the Policy Schedule. In addition, benefits paid for Respite Care after Your Elimination Period has been satisfied will reduce the Policy Limit.

**Care Advisory Services Benefit**

We will pay the Care Advisory Services Benefit if:

- You are receiving Care Advisory Services;
- the provider of Care Advisory Services submits a written record to Us, detailing their recommendations;
- the provider of Care Advisory Services submits their written assessment and an itemized bill; and
- You are eligible for the payment of benefits under this Policy.

LTC-02 NY                                                14

We will pay the actual charges for Care Advisory Services up to the Care Advisory Services Benefit Amount as shown in the Policy Schedule. You do not have to satisfy the Elimination Period.  The days for which You receive only the Care Advisory Services Benefit do not count toward the Elimination Period.  Benefits paid under the Care Advisory Services Benefit will not reduce the Policy Limit.

**Waiver of Premium Benefit**

We will waive the payment of premiums under this Policy if:

- You are receiving care or services for which benefits are payable under the Long-Term Care Benefit; and
- You have satisfied the Elimination Period

The waiver period will start the day after the Elimination Period has been satisfied and will end on the date when benefits are no longer payable. In the event You have already satisfied the Elimination Period, the waiver period will start on the next Date of Service and will end on the date when benefits are no longer payable under this Policy.

Your premium will not be waived if You are only receiving benefits under the Stay at Home Benefit, Respite Care Benefit or the Care Advisory Services Benefit.

If Your premium has been paid for a period for which premiums are waived, We will refund the premium for such period.  In order to keep this Policy in effect after the waiver of premium period ends, payment of premiums must be resumed.

**Extension of Benefits**

If eligibility for benefits under this Policy or Total Disability began while this Policy was in effect and continues without interruption after this Policy terminates (lapses), benefits for confinement in a Nursing Home  or an Assisted Living Facility or Home Health Care will continue to be paid.  However, such extension of benefits after this Policy has terminated (lapsed) will be subject to all of the provisions of this policy (including but not limited to the Policy Limit and the Elimination Period).

"Total Disability" means:

- You need Substantial Assistance to perform at least two of the Activities of Daily Living; or
- You require substantial supervision to protect Yourself from threats to health and safety due to the presence of a Cognitive Impairment.

**International Coverage Benefit**

**<u>Important Note</u> -- In the event You elected the 10-year or lifetime benefit period, no benefit will be paid under the International Coverage Benefit in excess of an amount equal to a 6-year Benefit Period times the Nursing Home Benefit Amount.**

If You require care or services which would otherwise be covered by this Policy while You are permanently residing outside the fifty (50) United States or the District of Columbia, We will pay the International Coverage Benefit if all the following requirements are met:

- We receive Proof of Loss which is satisfactory to Us that You have met Your Elimination Period and the requirements found in the sections captioned "Eligibility for the Payment of Benefits" and "Conditions".

- You provide Us (at Your own expense) with the following documentation as described in the "Conditions" section of the Policy:
  - the required  certification from a Licensed Health Care Practitioner:
  - a current Plan of Care and any required updates to that Plan of Care; and
  - properly completed claim forms and proof, satisfactory to Us, that You are receiving covered care and services.

- All required documentation must be provided to Us in English.

- We reserve the right to require that You provide us with updated documentation and information at reasonable intervals. However, We will not require updates more frequently than monthly.

We will pay actual charges incurred for certain Long-Term Care Services up to the International Coverage Benefit Amount as shown on the Policy Schedule.

Long-Term Care Services eligible for payment under the International Coverage Benefit include:

- confinement in a Nursing Home or Assisted Living Facility;
- Home Health Care, Adult Day Care and Hospice Care.

No benefits are payable under the Stay at Home Benefit, or for Respite Care or Care Advisory Services under the International Coverage Benefit.

Any benefit paid under this provision will reduce Your Policy Limit. All terms in the Policy will remain in effect.  Any benefits paid will be paid in United States currency.

LTC-02 NY                                                16

## PART 3 - EXCEPTIONS

**This part describes what care, treatment or services will be excluded under the Policy and when the benefit will not be paid.**

**Exceptions**

This Policy does not cover care, treatment or charges:

- for intentionally self-inflicted injury.
- required as a result of alcoholism or drug addiction (unless drug addiction was a result of the administration of drugs as part of treatment by a Physician).
- due to war (declared or undeclared) or any act of war, or service in any of the armed forces or auxiliary units.
- due to participation in a felony, riot or insurrection.
- normally not made in the absence of insurance.
- provided by a member of Your Immediate Family, unless
  - the family member is one of the following professionals -- a duly licensed registered nurse, licensed vocational nurse, licensed practical nurse, physical therapist, occupational therapist, speech therapist, respiratory therapist, licensed social worker, or registered dietitian; and
  - the family member is a regular employee of a Nursing Home, Assisted Living Facility, Adult Day Center or Home Health Care Agency which is providing the services;
  - the organization receives the payment for the services; and
  - the family member receives no compensation other than the normal compensation for employees in his or her job category.
- provided outside the fifty United States and the District of Columbia except as described in the International Coverage Benefit section of this Policy.

**Non-Duplication of Benefits**

This Policy will only pay covered charges in excess of charges covered under any of the following:

- Medicare (including amounts that would be reimbursed by Medicare but for the application of a Medicare deductible or coinsurance amounts).
- any other governmental program (except Medicaid).
- any state or federal workers' compensation, employer's liability or occupational disease law, or any mandatory motor vehicle no-fault law.

LTC-02 NY

17

## PART 4 - CLAIMS

**This part explains when to file Your claim, the information We need to review, process and pay Your claim, and Your and Our rights and responsibilities.**

*Early notification to Our Claims Department will facilitate a timely review of Your claim. Please let Us know immediately or in advance, whenever possible, when You need care or services covered by this Policy.  Please call Us at 1-800-377-7311.*

### HOW AND WHEN TO FILE A CLAIM

**Notice of Claim**

To file a claim You must first notify Us that You are currently receiving or plan to receive Long-Term Care Services covered by Your Policy.

You can notify Us by:

- writing to Us at Our LTC Administrative Office or contacting Us at Our website address - www.jhancock.com; or
- calling Us at Our LTC Administrative Office at 1-800-377-7311.

Your notice must include:

- Your name;
- Your Policy number; and
- the type of care You are receiving or plan to receive.

If You send Us written notice, Your notice must be mailed to Us postmarked within 45 days after Long-Term Care Services begin, or as soon as reasonably possible.  If You notify Us by telephone, You must call Us within 45 days after a covered loss begins or as soon as reasonably possible.  We will confirm, in writing, Your notification within 15 days after We receive such notification.

**Claim Forms and Proof of Loss**

When We receive Your notice of claim, We will send You claim forms for filing a Proof of Loss.  You must file Your Proof of Loss with Our LTC Administrative Office.

Proof of Loss means detailed written documentation which describes and confirms: Your inability to perform two or more of the Activities of Daily Living or Your Cognitive Impairment; Your confinement in a Nursing Home or Assisted Living Facility; or other care (e.g., Home Health Care, Respite Care, Care Advisory Services) You are receiving.

LTC-02 NY

18

This documentation includes:

- a completed claim form;
- confirmation of provider licensure as required by the jurisdiction in which it is located;
- the required certification from a Licensed Health Care Practitioner;
- itemized bills for Your care and services; and
- Your Plan of Care.

In addition, We may also request copies of medical records (or We may consult with Your primary Physician and provider by telephone at Our option) or Your providers' daily notes of care.

We will send You claim forms within 15 days after having received Your claim notification.  If We do not provide You with the claim forms within 15 days after having received Your notification, You will be able to satisfy the Proof of Loss provision by giving Us written proof of the nature and extent of Your loss.

Proof of Loss must be given to Us within ninety (90) days after the first Date of Service.  Failure to give Us proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible for You to give proof within such time.  However, the proof must be given to Us as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

In Your claim information packet, We will also enclose Our Advantage List, if such List is available in New York at the time of Your claim notification. The Advantage List will include a listing of long-term care providers that offer discounts to Our policyholders.  These discounts can help You extend your long-term care benefits.  Any unused portion of Your benefits will remain in the Policy Limit.  There is no penalty for using long-term care providers that are not included on this list.  Discounts may only relate to certain services or may vary by provider.  A provider may be added to, or removed from, this list at such provider's own or Our request at any time and the discount may be discontinued. In addition, in the event a provider is removed from the Advantage List while You are on claim, any discount associated with the provider will cease to be available. Please note that the discounted fees charged by a provider on the Advantage List may not be the least expensive fees available. You should review cost of care and services as well as the providers in Your area. In addition, We do not endorse, sponsor or guarantee the quality of a provider listed on the Advantage List, or the care or services provided by such provider. It is Your responsibility to choose a provider who will best meet Your long-term care and service needs.

**Our Claims Evaluation Process**

Upon receiving Your claim forms, We will work with You, Your Physician, Your care providers, or anyone acting on Your behalf, to obtain information about Your health and the care or services You are receiving.  We will then make an objective review of all the information We receive to determine whether You qualify for benefits as well as the level of benefits for which You qualify.  As part of Our review, We reserve the right to do a telephone interview, perform an on-site nursing or functional/cognitive assessment or require a physical exam when and as often as We may reasonably require while a claim is pending or any time during the claim. We will pay for any interview, assessment or examination that We request.

**Time of Payment of Claims**

Benefits under this Policy are payable on a monthly basis, after services have been rendered.

LTC-02 NY

19

**Payment of Claims**

While You are living, all benefits will be paid to You unless there is an assignment of benefits. An assignment of benefits is Your or Your legal representative's request for payments to be sent to someone other than Yourself. If You have made an assignment of benefits, We will send the payments to Your care provider or the individual You or Your legal representative have designated.

You may cancel or change an assignment of benefits at any time. We will not be on notice of any assignment unless it is in writing, nor until a duplicate of the original has been received at Our LTC Administrative Office. We assume no responsibility for the validity or sufficiency of any assignment.

Any accrued benefits unpaid at Your death will be paid to your estate. At our option, a benefit of up to $1,000 may be paid to someone related to You by blood or marriage, who We believe is equitably entitled to the benefit. We will be fully discharged to the extent of any payment made in good faith under this paragraph.

**Appeals**

We will notify You in writing if We do not approve Your claim and provide You with a written explanation of the reasons for the denial. You will then have the right to appeal Our claims decision and request that We make information directly related to such denial available to You. We will provide You with such requested information within 60 days from the date We receive Your written request.

You must put this appeal or request for information in writing (no special form is necessary) and send it to:

> John Hancock Life Insurance Company
> LTC Administrative Office
> PO Box 55978, Boston, MA 02205
> Attn: Manager of Claims Administration

In Your appeal, You should:

- state why You disagree with Our determination;
- state what other factors (if any) We should take into consideration; and
- identify whom We could contact (including names, addresses, and phone numbers) to gather any additional pertinent information regarding Your care.

You may authorize someone else to act for You in this appeals process. We have a Claim Appeals Review Board that will consider Your appeal. If the Board needs additional information to objectively evaluate Your appeal, they may use one or more of the following resources at Our expense:

- a Physician who will assess Your condition and report it to Us;
- an on-site geriatric assessment;
- medical records from Your Physician(s) and/or provider(s) of care; or
- other information that is determined to be relevant to address the appeal.

The Claim Appeals Review Board will make one of two determinations:

- overturn the initial claim determination and pay any benefits due; or
- uphold the initial claim determination.

The Claim Appeals Review Board will make and notify You of the determination within 60-days.

**Misstatement of Age**

If Your age has been misstated, We may either reduce Your Policy benefits or rescind Your Policy. In the event of a reduction of benefits, Your Policy benefits will be amended to be those that the premium paid would have purchased at Your correct age.  If as a result of such misstatement, We issued a Policy which would not have been issued to You had such misstatement not occurred, Your Policy will be rescinded.  In that case, Our liability under any such Policy will be limited to refund of the premium paid.

**Legal Action**

You may not bring suit against Us to recover benefits under this Policy until at least 60 days has expired after written Proof of Loss has been given to Us.  Also, You cannot bring suit against Us to recover benefits under this Policy after four years from the date a claim is denied.

## PART 5 - PREMIUMS AND REINSTATEMENT

**This part explains what happens if You do not pay the premium for this Policy when it is due.**

### WHEN AND WHERE PREMIUMS ARE PAYABLE

**Payment of Premiums**

Payment of the First Premium will keep this Policy in effect for the first premium payment period. This period starts at 12:01 a.m., Eastern Standard Time on the Effective Date of Coverage. It ends at midnight of the day before the next premium due date, subject to the Grace Period provision below. Each premium, after the first, is due at the end of the period for which the preceding premium was paid. Policy years, months and anniversaries are measured from the Effective Date of Coverage.

Your first premium must be paid at Our LTC Administrative Office or to any of Our duly authorized agents. Any subsequent premium payment must be paid to Our LTC Administrative Office. If a premium is paid to an agent, We will provide a receipt in exchange for such payment. To be valid, it must also be countersigned by the agent shown on the receipt. Payment of a premium will not keep this Policy in effect beyond the period for which it is paid, except as may be otherwise provided in this Policy.

You may elect to pay Your premium on an annual, semi-annual, quarterly or monthly basis. You may change Your mode of premium payment by making a written request to Us at Our LTC Administrative Office. Please note that the more often you pay, the higher your premium amount will be per year. Additional premium charges are included for semi-annual, quarterly, and monthly premiums. These charges are called "modal fees". These fees are based upon the following modal factors and are used to determine the premium amount for all payment options. The modal factors are 1.00 for annual, .52 for semi-annual, .27 for quarterly and .09 for monthly. To calculate Your approximate total annual premium payment based on Your current policy selection:

- multiply the "Base Policy Premium" as shown on the Policy Schedule by the factor associated with Your selected mode of payment, and then
- multiply that result by the number of payments required in a year based upon Your selected payment mode.

**Grace Period**

This Policy has a 65-day Grace Period. If a premium other than the initial premium is not paid within 30 days from the date that it is due, We will provide written notification of the nonpayment of the premium to You and the person or persons You designate to receive such notice at the addresses You provided to Us. You have an additional 35-day period to pay the premium after We have mailed this notice. During the Grace Period this Policy will stay in effect. If We do not receive the premium payment before the end of the Grace Period, this Policy will terminate.

You may designate a person or persons to receive such notice on Your application. You may change the designation or make a new designation at any time while this Policy is in effect, but it must be in writing and sent to Our LTC Administrative Office. Please note that You are responsible for notifying Us of any change in address of Your designee. We will provide You with a reminder of the right to change this written designation every two years.

LTC-02 NY

## REINSTATEMENT AND LAPSE PROTECTION

**Reinstatement**

An application and payment of premium is required to reinstate the policy.  We will issue a conditional receipt for the premium paid. If the application is approved and payment received, the Policy will be reinstated as of the last premium due date.  If it is disapproved, We will inform You in writing within 45 days of such disapproval and any premium paid will be returned to You promptly.  If We fail to inform You, the Policy will be reinstated upon such 45th day.  Later acceptance of the premium by Us, without requiring an application for reinstatement, will reinstate the Policy.

The reinstated Policy will cover only loss due to an injury sustained or physical or mental condition that begins after the date of reinstatement.  Except for this and any new provisions added in connection with reinstatement, Your rights and Ours under this Policy will be the same as they were just before the Policy terminated.  A physical or mental condition will be considered to have begun when advice or diagnosis is supplied or treatment is recommended by or received from a Physician for such condition.

**Added Protection Against Lapse**

If Your Policy terminates because You did not pay the premium due, You may obtain reinstatement of this Policy, if You so request, within 5 months after the date of termination, and You meet the following conditions:

- You furnish Us with satisfactory proof that You were unable to perform at least two of the Activities of Daily Living; or had a Cognitive Impairment on the date of termination; and
- You pay all the unpaid overdue premiums.

## REFUND OF UNEARNED PREMIUMS

**Refund of Unearned Premiums at Death**

Upon receipt of proof that You have died, We will refund the portion of premium paid between the date of death and the next premium due date.  Such refund will be made to Your surviving spouse, if any, otherwise to Your estate.

LTC-02 NY

23

**PART 6 - GENERAL PROVISIONS**

**This part explains some of the important provisions that affect Your rights and Our rights under this Policy.**

**Entire Contract and Changes**

This Policy is a legal binding contract between You and Us.  This entire contract is made up of:

- the Policy;
- the application; and
- any riders, amendments and endorsements.

No change to this Policy will be valid until approved by Our President or Secretary.  To be valid, such approval must also be endorsed on or attached to this Policy.  No agent may change this Policy or waive any of its provisions.  If We change Our address or Our toll-free telephone number, We will notify You.

**Time Limit on Certain Defenses/Misrepresentation**

If this Policy has been in effect for less than six months We may rescind it or deny an otherwise valid claim if the application contained a misrepresentation that is material to the acceptance of Your application.

If this Policy has been in effect for at least six months but less than two years, We may rescind it or deny an otherwise valid claim if the application contained a misrepresentation that:

- was material to the acceptance of Your application; and
- pertains to the condition for which the claim is made.

After this Policy has been in effect for two years, it is incontestable except for relevant facts relating to Your health that You knowingly and intentionally misrepresented or failed to disclose.

In the event this Policy is rescinded after We have paid benefits, We may not recover the payments already made.

**Conformity with State Laws**

Any part of this Policy which is in conflict with the laws of the state in which You reside on the Effective Date of Coverage is amended to conform to the minimum requirements of such laws.

LTC-02 NY                                          24

**Right to Recovery**

If We make payments with respect to benefits in a total amount which is, at any time, in excess of the benefits payable under the provisions of this Policy, We will have the right to recover such excess from:

- any persons to, or for, or with respect to whom, such payments were made; and
- any organization which should have made such payments.

**Suspended Coverage During Military Service**

If You are a member of a reserve component of the armed forces of the United States, including the National Guard, You may request in writing a suspension of this Policy during a period of active duty. This does not apply to active duty for training that lasts 90 days or less.

This Policy will not be in force while it is suspended, and You will not be required to pay premiums. We will refund that part of any premium paid for the suspended period.

Upon termination of military service of no longer than five years, You may renew coverage on the same basis as before suspension of coverage took effect.

Renewal will take effect on the date military service terminates, subject to written application and payment of the required premium within sixty days after such date.  No proof that You are insurable is needed.  Premiums will be at the same rate as if this Policy was never suspended.  The restored Policy will not cover any condition that arose during the period of active duty and that condition has been determined by the Secretary of Veterans' Affairs to be incurred in the line of duty.

**Policy Termination**

This Policy will terminate at 12:01 a.m. on the earliest occurrence of one of the following events:

- You have exhausted Your Policy Limit.
- You do not pay Your premium when due (see the provision captioned "Grace Period");
- You cancel Your Policy; or
- The date of Your death.

LTC-02 NY                                           25

**COPY OF APPLICATION**

NOTE:  Examine this copy carefully.  If You find any error or omission, write or contact Our LTC Administrative Office immediately.  Please explain fully the error or omission and give Us Your policy number.

LTC-02 NY                                            26

**LONG-TERM CARE INSURANCE**

Countersigned (When required by law or regulation)

Date _____

_____
Resident Licensed Agent

**NOTICE**

If You have any questions about this Policy, write Us at Our LTC Administrative Office, PO Box 55978, Boston, MA 02205 or call Us toll-free at 1-800-377-7311.

LTC-02 NY                                    27



## JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.)

## ENDORSEMENT

## 2.7% SIMPLE INFLATION COVERAGE

**This Endorsement explains how Your Long-Term Care Benefit Amount increases each year to provide protection against the increasing cost of long-term care due to inflation.**

This Endorsement is part of, and attached to Your Policy and is subject to all the provisions of the Policy unless otherwise provided below. This Endorsement replaces any prior inflation coverage Endorsement that was previously a part of Your Policy.   Any inflation increases that were applied to Your Policy up to the Effective Date of this Endorsement will not be affected by this Endorsement.

## 2.7% Annual Increase in Long-Term Care Benefit Amount

We will increase the Long-Term Care Benefit Amount by 2.7% of Your original amount, while this Policy is in effect, beginning with the first Policy anniversary which follows the effective date of this Endorsement. Such increases will continue automatically while this Policy is in effect.

When the Long-Term Care Benefit Amount is increased, the remaining Policy Limit (as well as other remaining Benefit Amounts listed in the Policy Schedule) will be increased by the same percentage as the increase in the Long-Term Care Benefit Amount.

No inflation adjustment will be made while this Policy is in effect under the provisions of any nonforfeiture benefit.

**The premium for this inflation coverage is included in Your Policy premium. Your premium will not change, except as described in the Policy.**

Nothing in this Endorsement will extend termination of the Policy or create a new Policy Limit after the then applicable Policy Limit is exhausted.

## Termination

This Endorsement will terminate when the Policy terminates, or when the Policy is continued under the provisions of any nonforfeiture benefit.

Signed for the Company at Boston, Massachusetts:

*Emanuel Alves*

Secretary

LTC-SIMP2.7 4/11                                                1



## John Hancock Life Insurance Company

## Contingent Nonforfeiture Protection Endorsement

**This Endorsement explains what protections are available to You in the event You lapse Your policy due to a premium rate increase.**

This Endorsement is part of, and should be attached to Your Policy. It is subject to all the provisions of the Policy unless otherwise provided below.

### What Happens if We Increase Premium Rates?

If We increase Your premium to a level which results in a cumulative increase of Your annual premium which equals or exceeds the percentage of Your initial premium based upon Your original issue age as set forth below, We will inform You of Your right to:

- reduce Your current Policy benefits without any underwriting, so that the required premium payments are not increased; or
- convert Your current coverage pursuant to the Contingent Nonforfeiture Benefit described below.

| Issue Age | % Increase Over Initial Premium | Issue Age | % Increase Over Initial Premium | Issue Age | % Increase Over Initial Premium |
|---|---|---|---|---|---|
| 29 and under | 200% | 66 | 48% | 79 | 22% |
| 30-34 | 190% | 67 | 46% | 80 | 20% |
| 35-39 | 170% | 68 | 44% | 81 | 19% |
| 40-44 | 150% | 69 | 42% | 82 | 18% |
| 45-49 | 130% | 70 | 40% | 83 | 17% |
| 50-54 | 110% | 71 | 38% | 84 | 16% |
| 55-59 | 90% | 72 | 36% | 85 | 15% |
| 60 | 70% | 73 | 34% | 86 | 14% |
| 61 | 66% | 74 | 32% | 87 | 13% |
| 62 | 62% | 75 | 30% | 88 | 12% |
| 63 | 58% | 76 | 28% | 89 | 11% |
| 64 | 54% | 77 | 26% | 90 and over | 10% |
| 65 | 50% | 78 | 24% | | |

In addition, this notification will inform You that if You lapse Your Policy within 120 days of the new premium due date, We will automatically convert Your current coverage pursuant to the Contingent Nonforfeiture Benefit described below.

We will notify You in writing at least 30 days prior to the due date of any new increased premium.

LTC-CNFD                                1

Please note that reference to a premium increase in this Endorsement does not include any increase attributable to Your voluntary election of additional or increased benefit levels or new Policy provisions.

Please note that if the cumulative increase is less than the percentage set forth above, the Contingent Nonforfeiture Benefit will not be available to You.

**If You Elect to Decrease Your Benefits**

If You elect to decrease Your current Policy benefits, You may:

- eliminate any optional riders for which a premium is charged; or
- reduce Your Long-Term Care Benefit Amount in $10 increments. Note, any other benefit amounts and the Policy Limit will decrease accordingly in the same ratio to the Long-Term Care Benefit Amount. Also, if You have any optional inflation coverage in force, such optional inflation coverage will continue to apply to the reduced amounts.

If additional benefit reduction options are available at the time of the premium increase notice, We will include information regarding these options in such notice.

A request for the change must be made to Us in writing and is not subject to evidence of insurability. Your premium will be based on the reduced amount of coverage and Your original issue age.

**Contingent Nonforfeiture Benefit**

If You elect the Contingent Nonforfeiture Benefit or You lapse Your Policy within 120 days of the new premium due date and do not elect to reduce Your benefits, this Contingent Nonforfeiture Benefit will modify the Policy Limit and change Your Policy to paid up status where no further premium is due.

The new Policy Limit on the effective date of Your paid up status will be equal to the total premium You have paid. However, in no event will the new Policy Limit ever be less than thirty (30) times the Long-Term Care Benefit Amount at the time of lapse.

No benefits will be paid in excess of the new Policy Limit. Benefits will be paid subject to the Long-Term Care Benefit Amount level (and other coverage limits) in effect at the time You lapsed Your Policy. All optional benefit riders will automatically terminate when Your Policy changes to paid-up status under the provisions of the Contingent Nonforfeiture Benefit. In addition, no inflation adjustment will be made while the Policy is in effect under the Contingent Nonforfeiture Benefit.

Signed for the Company at Boston, Massachusetts:


Secretary


LTC-CNFD                                    2

*John Hancock.*

Long-term care insurance is underwritten by John Hancock Life Insurance Company (U.S.A.), Boston, MA 02210
(not licensed in New York) and in New York by John Hancock Life and Health Insurance Company, Boston, MA 02117.

LTC-3349B 1/09
REV. 9/16

# EXHIBIT 2

*John Hancock.*

# Claim Initiation Form

**John Hancock Life & Health Insurance Company**
✉ ATTN: R-02-B Long-Term Care

Boston, MA 02117-0852
☎ Phone: ███████  Fax: ███████

Insured Name: Blime Feldheim

Claim Number: ███████

## Introduction

Completion of this form may be necessary to begin the claim process. Please be aware that you are required to provide accurate and complete information to the best of your knowledge and ability. Any failure to do so could jeopardize the claim. **Form completion does not guarantee claim approval and/or benefit payment.**

## 1. Demographic Information for Blime Feldheim

**PLEASE INDICATE THE INSURED'S CURRENT STATUS:**

☑ RECEIVING SERVICES/NEEDS ASSISTANCE   ☐ RECOVERED, RECEIVED SERVICES PRIOR TO RECOVERY   ☐ DECEASED, RECEIVED SERVICES PRIOR TO DEATH

**Primary Residence:**

███████

Facility Name (if applicable)

**Current Location (if not Primary Residence):**

Facility Name (if applicable)

Primary Residence Street Address

| MONSEY | N.Y. | 10952 |
|---|---|---|
| City/Town | State | Zip Code |

███████

Preferred Contact Phone

Current Location Street Address

| | | |
|---|---|---|
| City/Town | State | Zip Code |

Preferred Contact Phone

**Married:** ☑ YES   ☐ NO   **Date of Birth:** | ███████ | / | 76 |
MM  DD    YYYY

**Who is the primary contact for this claim?**

☑ INSURED   ☐ OTHER: _____

**If OTHER, please complete the contact information below:**

Primary Contact Name

Primary Contact Street Address

| | | |
|---|---|---|
| City/Town | State | Zip Code |

Preferred Contact Phone

**Continued on Reverse ➡**

**If INSURED, where should we send claim correspondence?**

☑ PRIMARY RESIDENCE   ☐ CURRENT LOCATION

Relationship to the Insured

**Power of Attorney or Guardian for Insured:** ☐ YES   ☐ NO
If YES, attach a copy of the documentation.

LTCC-INTAKE edition 2/2015

## 2. Claim Information

1. Brief explanation of why claim is being filed: UNABLE TO WALK w/o assistance, unable to lift needs assistance w/shower + getting dressed, needs assistance meal prep needs assistance getting to bathroom - has spinal stinosis, x breathing difficulzies

2. Is this claim being opened because the insured needs assistance with any of the following activities: bathing, dressing, eating, toileting, maintaining continence, mobility, transferring from bed to chair?    ☑ YES ☐ NO

   If YES, the approximate date the assistance began?   [ 3 ] / [ 30 ] / [ 2018 ]
   MM        DD        YYYY

3. Is this claim being opened because the insured needs supervision due to memory or cognitive issues resulting from a diagnosis such as Alzheimer's or dementia?    ☐ YES ☑ NO

   If YES, the approximate date the assistance began?   [    ] / [    ] / [        ]
   MM        DD        YYYY

4. Is this claim being opened for any of the following reasons:
   Result of injuries sustained due to a motor vehicle accident?    ☐ YES ☑ NO
   Result of a work-related injury?    ☐ YES ☑ NO
   Hospice Services?    ☐ YES ☑ NO
   (If YES to Hospice Services, furnish provider detail on the Provider Information Form.)

5. If currently in a Skilled Nursing Facility, please provide the expected discharge date/time frame (if known): _____

6. Is this claim related to more than one John Hancock policy that covers long-term care services?    ☐ YES ☑ NO

   If YES, please list all policy numbers (for group/employer-sponsored plans, list the Employer name):
   _____

## 3. Acknowledgement

Any person who, with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties. Please refer to enclosed state variation sheet for state-specific wording regarding the above fraud statement.

Before we can process your claim, you need to certify by signing below that the information you have provided on this form is accurate and complete to the best of your knowledge and ability.

**Sign Here ➤**    *Blime Feldal*    5/27/18
Signature of INSURED or POWER OF ATTORNEY or GUARDIAN    Date

BLIME FELDHEIM
Print Name of INSURED or POWER OF ATTORNEY or GUARDIAN

Please note: In order to accept a signature other than the insured's on this form, please submit written authorization (such as Power of Attorney).

# EXHIBIT 3

Attn:  R-02-B Long-Term Care Department
John Hancock Life & Health Insurance Company

Boston, MA 02117-0852

*JohnHancock*

June 12, 2018
501

Blime Feldheim

Monsey, NY  10952

Re: John Hancock Long-Term Care

Dear Blime Feldheim:

We are writing to provide you with an update regarding the eligibility status of your long-term care service provider(s). Based on the information we received, the following provider(s) meet the criteria of an eligible provider as defined in your policy:

| Approved Provider Name | Provider Type |
|---|---|
| Caring Connections Llc | Home Health Care Agency |

Please note:  you must be determined to meet the benefit eligibility criteria and receive a covered service as defined in your policy for any charge to be considered as a credit toward your Elimination Period and/or for reimbursement.

Provider approval is based on the information submitted to us and is contingent upon the provider's employed staff providing covered service to you.  Your provider's approval status may change if the services supplied to you are outsourced or provided by an entity other than the approved provider.  If any of the information supplied to us is incorrect or inaccurate, that provider may no longer qualify under your policy.

Please review the attached *Additional Provider Information* sheet for important information about the reimbursement process. Contact John Hancock as soon as possible if you change providers, in order to avoid reimbursement delays.

**Did you know?**  John Hancock Long-Term Care now offers a way to submit invoices for reimbursement online for any active, current claims.  Rather than sending us your invoices via mail or fax, you can now use our online tool and upload your invoices directly, through our secure website.  Visit www.jhltcclaims.com and follow the simple steps to register.

If you have any questions or need assistance, please contact the LTC Customer Service Center at ▮▮▮▮▮▮▮▮ between 8 a.m. and 6 p.m., Eastern Time, Monday through Friday. You can also visit www.jhltcclaims.com.

Sincerely,

**Peter Burke**
**Assistant Vice President, LTC Claims Operations**

CC:  Blime Feldheim

**Enclosures** (Forms are attached only for the designated Main Contact.)

# Additional Provider Information



**Insured Name:** *Blime Feldheim*   | ███████████████████

### Am I eligible for reimbursement now?

Before any charges can be reimbursed, it is necessary for us to determine if you meet the benefit eligibility criteria defined in your policy. This letter confirms that the provider(s) listed in the Approved Provider list meets the eligibility criteria for a provider under your policy, but this does not mean that your claim is approved and ready for reimbursement. At the time this letter was created, your claim was still under review for benefit eligibility. You will be notified under separate cover as soon as this determination is complete. After benefit eligibility is confirmed, you must satisfy the Elimination Period as described in your policy.

Once benefit eligibility has been established and you have met the Elimination Period, you will be eligible for reimbursement for covered services delivered by an approved provider.

In order for us to credit services to the Elimination Period or make ongoing payments, we require itemized billing statements for every date of service.  This includes services that may have been covered by Medicare (including UB04 bills). Please ensure that your name, claim number, and policy number are on these documents when they are submitted.

Payment and/or credit to your Elimination Period will not be made for any service incurred prior to the effective date of benefit eligibility communicated in the benefit eligibility approval letter.

### How do I get reimbursed for services once I have met benefit eligibility and provider eligibility and completed my Elimination Period?

You must submit bills for any covered service that you receive. We recommend that you submit bills on a monthly basis. In addition to the insured name and Coverage ID, each bill must detail:
- The type of service provided
- The date of each service
- The amount charged for service
- The provider name

Payments will be made directly to you, by check, at your primary address. Services will be reimbursed based on the type and level of service received and payment will not exceed policy benefit limits.

With every payment, you will receive an Explanation of Benefits (EOB) that includes an explanation of how we processed the charges and what was reimbursed.

We encourage you to evaluate whether your provider's rates are customary for your local area.  A provider charging reasonable rates will help your policy benefits to last as long as possible.

If you change providers in the future, please contact John Hancock as soon as possible to ensure that your new provider meets policy requirements so that benefit payments are not delayed or suspended.

# EXHIBIT 4



## Policy Information

**Policy Number:** ███████    **Claim Number:** ████████

## Invoice Details

**Provider:** Caring Connections LLC

**Service Date From:** 09/29/2018

**Submitted By:** blime feldheim

**Date Submitted:** 10/16/2018

**Total Charges:** $6,720.00

**Service Date To:** 10/12/2018

**Email Address:** ███@thecaringconnections.com

**Phone Number:** ████████

**Q1: Were the care services performed at home?**
Yes

**Q1a. If No, where were they performed and on what dates?**
N/A

**Additional Information:**

**Fraud Attestation:**

☑ I attest to the knowledge that an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties.

I-100429



Caring Connections

Airmont NY 10952

@thecaringconnections.com



# Fax

| To: John Hancock | From: Caring Connections/ Leah Lebovits |
|---|---|
| --<br>Fax: | Phone: |
| Date: 10/15/2018 | Pages w/cover: |

☐ Urgent  ☐ Per Your Request  ☐ For Review  ☐ Please Reply

**Comments:**

**Insured: Blime Feldheim**

**Dob-** ▮▮▮ **/1946**

**Claim Number-** ▮▮▮▮▮▮

**POLICY NUMBER** ▮▮▮▮

ATTACHED PLEASE SEE INVOICES AND CARE NOTES

SERVICES FROM September 29th through October 12th

Please call us should you have any questions

Caring connections home care provider

This communication and all attachments are confidential and may be legally privileged. If you are not the intended recipient, (i) please do not read or disclose any content to others, (ii) please notify the sender by reply (e-mail or fax) immediately, and (iii) please destroy this document. Failure to follow this process may be unlawful and subject to prosecution. Thank you for your cooperation.



Caring Connections

██████████

Airmont NY 10952

# Invoice

| Date | Invoice # |
|---|---|
| 10/15/2018 | 1722 |

| Bill To | Ship To |
|---|---|
| Vera Blimy  Feldheim<br>██████████<br>Monsey, NY 10952 | Vera Blimy  Feldheim<br>██████████<br>Monsey, NY 10952 |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
|  |  |  | 10/15/2018 |  |  |  |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | COMP | COMPANION CARE SERVICE 09/29/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 09/30/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/01/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/02/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/03/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/04/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/05/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/06/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/07/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/08/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/09/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/10/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/11/2018 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 10/12/2018 |  | 480.00 | 480.00 |

**Total** $6,720.00

FAX

# Client Weekly Documentation Logs

*A Senior Home Care Company*

Client Name: Feldheim Vera Blimy    Caregiver Name: John Elison

Starting Saturday : date: 9/29/18   Ending Friday : date: 10/5/18

*Please place a check mark for each service task performed on the day it was provided*

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Mobitlity/Activity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Ambulation Assistance | | | | | | | | | | |
| Cane / Walker Assistance | | | | | | | | | | |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment/TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| TRANSFERING | | | | | | | | | | |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| Meal Preparation | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared B-fast | | | | | | | | | | |
| Prepared Lunch | | | | | | | | | | |
| Prepared Dinner | | | | | | | | | | |
| Prepared Snack | | | | | | | | | | |
| Total Feeding | | | | | | | | | | |
| Feeding Assistacnce | | | | | | | | | | |
| Declined a meal | | | | | | | | | | |
| Errands / Appointments | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Erands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| Housekeeping | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Laundry | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Change Linen | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Vacuum | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Dusting | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Bedroom | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Bathrooms | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Dining/ Living Room | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Mop / Sweep | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Cleared kitchen | | | | | | | | | | |
| Medication Reminders | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| Personal Care | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Tub Bath/Shower assistance | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth /Denture care | | | | | | | | | | |
| Dressing Assistance | | | | | | | | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | | | | | | | | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Comode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

| Client Signature | | 10 5 18 |
|---|---|---|
| Caregiver Signature | J.E | 10 5 18 |

FAX

# Client Weekly Documentation Logs

*A Senior Home Care Company*

Client Name: Feldheim , Vera Blimy        Caregiver Name: John Ellison

Starting Saturday :date: 10-6-18   Ending Friday :date: 10-12-18

*Please place a check mark for each service task performed on the day it was provided*

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Mobitlity/Activity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Ambulation Assistance | | | | | | | | | | |
| Cane / Walker Assistance | | | | | | | | | | |
| Wheechair Assistance | | | | | | | | | | |
| Entertainment / TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| TRANSFERING | | | | | | | | | | |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | ✓ | | | | | | | | | |
| Meal Preparation | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared B-fast | | | | | | | | | | |
| Prepared Lunch | | | | | | | | | | |
| Prepared Dinner | | | | | | | | | | |
| Prepared Snack | | | | | | | | | | |
| Total Feeding | | | | | | | | | | |
| Feeding Assistacnce | | | | | | | | | | |
| Declined a meal | | | | | | | ✓ | | | |
| Errands / Appointments | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Erands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| Housekeeping | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Laundry | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Change Linen | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Vacuum | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Dusting | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Bedroom | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Bathrooms | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Dining/ Living Room | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Mop / Sweep | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Cleaned kitchen | | | | | | | | | | |
| Medication Reminders | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| Personal Care | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Tub Bath/Shower assistance | | | | | | | | | | |
| Bec Bath/Sponge Bath | | | | | | | | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth /Denture care | | | | | | | | | | |
| Dressing Assistance | | | | | | | | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | | | | | | | | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Comode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

Client Signature _____          10/12/18

Caregiver Signature   J.E                                       10/12-18

# EXHIBIT 5



## Policy Information

███████████████████████████████████████████████

## Invoice Details

**Provider:** Caring Connections

**Total Charges:** $6,720.00

**Service Date From:** 07/02/2022

**Service Date To:** 07/15/2022

**Submitted By:** Caring Connections

**Date Submitted:** 07/19/2022

**Phone Number:**

████████████████████@thecaringconnections.com

**Q1: Were the care services performed at home?**
Yes

**Q1a. If No, where were they performed and on what dates?**
N/A

**Additional Information:**

**Fraud Attestation:**

☑ I attest to the knowledge that an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties.

I-1019208

# Invoice

| Date | Invoice # |
|---|---|
| 7/19/2022 | 7744 |

█████████
Airmont NY 10952

| Bill To | Ship To |
|---|---|
| Vera Blimy  Feldheim<br>█████████<br>Monsey, NY 10952 | Vera Blimy  Feldheim<br>█████████<br>Monsey, NY 10952 |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
|  |  |  | 7/19/2022 |  |  |  |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | COMP | COMPANION CARE SERVICE 07/02/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/03/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/04/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/05/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/06/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/07/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/08/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/09/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/10/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/11/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/12/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/13/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/14/2022 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 07/15/2022 |  | 480.00 | 480.00 |

| | Total | $6,720.00 |
|---|---|---|

| Phone # | Fax # | E-mail |
|---|---|---|
| ████ | ████ | ███@thecaringconnections.com |

FAX

# Client Weekly Documentation Logs

Client Name: Yeta Blimu Feldheim          Caregiver Name:

Starting Saturday :date: 07/02/22 Ending Friday :date: 07/08/22

Please place a check mark for each service task performed on the day it was provided

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Monitor patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | Sat. | 8am | 9pm |
| Mobility/Activity | | | | | | | | Sun | 8am | 9pm |
| Ambulation Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Cane / Walker Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | Mon | 8am - | 9pm |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment / TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| TRANSFERING | | | | | | | | | | |
| Transfer board | | | | | | | | Tue | 8am - | 9pm |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| Meal Preparation | | | | | | | | | | |
| Prepared B-fast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | Wed | 8am - | 9pm |
| Prepared Lunch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Snack | | | | | | | | | | |
| Total Feeding | | | | | | | | Thur. | 8am - | 9pm |
| Feeding Assistance | | | | | | | | | | |
| Declined a meal | | | | | | | | | | |
| Errands / Appointments | | | | | | | | | | |
| Medical Appointments | | | | | | | | Fri. | 8am - | 9pm |
| Shopping/ Errands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| Housekeeping | | | | | | | | | | |
| Laundry | | | | | | | | | | |
| Change Linen | | | | | | | | | | |
| Vacuum | | ✓ | | | ✓ | | | | | |
| Dusting | | | | | | | | | | |
| Clean Bedroom | ✓ | | | ✓ | | ✓ | | | | |
| Clean Bathrooms | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Dining/ Living Room | | | | | | | | | | |
| Mop / Sweep | | | | | | | | | | |
| Empty Trash | | | | | | | | | | |
| Refrigerator / Stove | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| Medication Reminders | | | | | | | | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| Personal Care | | | | | | | | | | |
| Tub Bath/Shower assistance | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth / Denture care | | | | | | | | | | |
| Dressing Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Comode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan. By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.**

Client Signature _____ 7/8/22

Caregiver Signature _____ 7/8/22

# Client Weekly Documentation Logs

**Client Name:** Vera Blimu Feldheim          **Caregiver Name:**

**Starting Saturday :date:** 7/9/22 **Ending Friday :date:** 7/15/22

*Please place a check mark for each service task performed on the day it was provided*

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Monitor Patient safety | √ | √ | √ | √ | √ | √ | √ | | | |
| personal Care needs met | √ | √ | √ | √ | √ | √ | √ | | | |
| Nutritional needs met | √ | √ | √ | √ | √ | √ | √ | Sat. | 8am | 9pm |
| Mobility/Activity | | | | | | | | Sun | 8am | 9pm |
| Ambulation Assistance | √ | √ | √ | √ | √ | √ | √ | | | |
| Cane / Walker Assistance | √ | √ | √ | √ | √ | √ | √ | Mon | 8am – | 9pm |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment /TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| TRANSFERING | | | | | | | | Tue | 8am – | 9pm |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| Meal Preparation | | | | | | | | | | |
| Prepared B-fast | √ | √ | √ | √ | √ | √ | √ | Wed | 8am – | 9pm |
| Prepared Lunch | √ | √ | √ | √ | √ | √ | √ | | | |
| Prepared Dinner | √ | √ | √ | √ | √ | √ | √ | | | |
| Prepared Snack | | | | | | | | Thur. | 8am – | 9pm |
| Total Feeding | | | | | | | | | | |
| Feeding Assistance | | | | | | | | | | |
| Declined a meal | | | | | | | | | | |
| Errands / Appointments | | | | | | | | Fri. | 8am – | 9pm |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Erands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| Housekeeping | | | | | | | | | | |
| Laundry | | | | | | | | | | |
| Change Linen | | | | | | | | | | |
| Vacuum | | √ | | | √ | | | | | |
| Dusting | | | | | | | | | | |
| Clean Bedroom | √ | | | √ | | √ | | | | |
| Clean Bathrooms | √ | √ | √ | √ | √ | √ | √ | | | |
| Clean Dining/ Living Room | | | | | | | | | | |
| Mop / Sweep | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| Medication Reminders | | | | | | | | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| Personal Care | | | | | | | | | | |
| Tub Bath/Shower assistance | √ | √ | √ | √ | | √ | √ | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Monitored bathing safely only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth /Denture care | | | | | | | | | | |
| Dressing Assistance | √ | √ | √ | √ | √ | √ | √ | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | √ | √ | √ | √ | √ | √ | √ | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | √ | √ | √ | √ | √ | √ | √ | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Commode / Bed pan assistance | | | | | | | | | | |

***Please notify office if client requests additional personal care services that are not noted in this client's care plan. By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

**Client Signature** _[signature]_          7/15/22

**Caregiver Signature** _[signature]_          7/15/22

# EXHIBIT 6



## Policy Information

████████████████████████████████████████████

## Invoice Details

**Provider:** caring connections

**Total Charges:** $9,030.00

**Service Date From:** 04/06/2024

**Service Date To:** 04/19/2024

**Submitted By:** caring connections

**Date Submitted:** 04/21/2024

**Phone Number:**

████████████████@thecaringconnections.com

**Q1: Were the care services performed at home?**
Yes

**Q1a. If No, where were they performed and on what dates?**
N/A

**Additional Information:**

**Fraud Attestation:**

☑  I attest to the knowledge that an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties.

I-1991499

# **Invoice**

| Date | Invoice # |
|---|---|
| 4/21/2024 | 60482 |

██████████████████
Airmont NY 10952

| Bill To |
|---|
| Vera Blimy   Feldheim |
| ████████████ |
| Monsey, NY 10952 |
| 1380046 |

| Ship To |
|---|
| Vera Blimy   Feldheim |
| ███████████ |
| Monsey, NY 10952 |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| | | | 4/21/2024 | | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | COMP | COMPANION CARE SERVICE 04/06/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/07/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/08/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/09/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/10/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/11/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/12/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/13/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/14/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/15/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/16/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/17/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/18/2024 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 04/192024 | | 645.00 | 645.00 |

| **Total** | $9,030.00 |
|---|---|

| Phone # | Fax # | E-mail |
|---|---|---|
| ███████████████████ | | @thecaringconnections.com |


Caring
Connections
WHERE HOME AND CARE CONNECT

# Client Weekly Documentation Logs

Client Name: Vera Blima Feldheim          Caregiver Name:

Starting Monday:date: 4 6 24          Ending Sunday:date: 4/12/24

*Please place a check mark for each service task performed on the day it was provided*

| | M | T | W | TH | F | Sat | Sun | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | ✓ | ✓ | ✓ | / | / | / | ʃ | 4 6 | 8 AM | 9 PM |
| personal Care needs met | ✓ | / | / | / | / | / | ✓ | 4 7 | 8 AM | 9 PM |
| Nutritional needs met | ✓ | / | / | / | / | / | ✓ | 4 8 | 8 AM | 9 PM |
| **Activities w/ client** | | | | | | | | 4 9 | 8 AM | 9 PM |
| Entertainment / TV | | | | | | | | | | |
| Games/cards | | | ✓ | | | | | 4 10 | 8 AM | 9 PM |
| Read book | | | | | | | | | | |
| Senior Center Visit | | | | . | | | | 4 11 | 8 AM | 9 PM |
| Shopping | ✓ | ✓ | | | | | | | | |
| Walking | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4 12 | 8 AM | 9 PM |
| Attended event | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Meal prep** | | | | | | | | | | |
| Prepared B-fast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Lunch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | ✓ | ✓ | ✓ | / | / | / | ✓ | | | |
| Declined a meal | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Errands / Appointments** | | | | | | | | | | |
| Doctor Visit | | | | | | | | | | |
| Grocery Shopping | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Housekeeping** | | | | | | | | | | |
| Laundry | ✓ | | ✓ | | ✓ | | ✓ | | | |
| Ironing | ✓ | | ✓ | | ✓ | | ✓ | | | |
| Vacuum | | ✓ | | ✓ | | ✓ | | | | |
| Dust | | ✓ | | ✓ | | ✓ | | | | |
| Changed bedding | | | | | | | | | | |
| Bathrooms | | | | | | | | | | |
| Tidy, sweep, mop, etc. | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Medication Reminders** | | | | | | | | | | |
| Morning pills | | | | | | | | | | |
| Taken | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Afternoon pills | | | | | | | | | | |
| Taken | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Evening pills | | | | | | | | | | |
| Taken | | | | | | | | | | |
| **Personal Care** | | | | | | | | | | |
| Bath/Shower assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined bath | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Lotion (Non-prescription) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Teeth/Denture care | | | | | | | | | | |
| Dressing Assistance | | | | | | | | | | |
| Hair care (no cutting hair) | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Shaved | | | | | | | | | | |
| Cleaned bedside comode | | | | | | | | | | |
| Changed briefs | | | | | | | | | | |
| Toileting assistance | | | | | | | | | | |
| Declined toileting/incontinence care | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

| Client Signature | Vera Blima Feldhe | 4/12/24 |
|---|---|---|
| Caregiver Signature | | 4/12/24 |


Caring
Connections
WHERE HOME AND CARE CONNECT

# Client Weekly Documentation Logs

**Client Name:** Vera Blima Feldheim    **Caregiver Name:**

**Starting Monday:date:** 4/3/24    **Ending Sunday:date:** 4/19/24

*Please place a check mark for each service task performed on the day it was provided*

| | M | T | W | TH | F | Sat | Sun | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4/13 | 8am | 9pm |
| personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4/14 | 8am | 9pm |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4/15 | 8am | 9pm |
| **Activities w/ client** | | | | | | | | 4/16 | 8am | 9pm |
| Entertainment / TV | | | | | | | | 4/17 | 8am | 9pm |
| Games/cards | | | | | | | | 4/18 | 8am | 9pm |
| Read book | | | | | | | | 4/19 | 8am | 9pm |
| Senior Center Visit | | | | | | | | | | |
| Shopping | | | | | | | | | | |
| Walking | | | | | | | | | | |
| Attended event | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Meal prep** | | | | | | | | | | |
| Prepared B-fast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Lunch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Declined a meal | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Errands / Appointments** | | | | | | | | | | |
| Doctor Visit | | | | | | | | | | |
| Grocery Shopping | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Housekeeping** | | | | | | | | | | |
| Laundry | ✓ | ✓ | | ✓ | ✓ | | ✓ | | | |
| Ironing | ✓ | ✓ | | ✓ | ✓ | | ✓ | | | |
| Vacuum | | | ✓ | | | ✓ | | | | |
| Dust | | | ✓ | | | ✓ | | | | |
| Changed bedding | | | | | | | | | | |
| Bathrooms | | | | | | | | | | |
| Tidy, sweep, mop, etc. | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **Medication Reminders** | | | | | | | | | | |
| Morning pills | | | | | | | | | | |
| Taken | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Afternoon pills | | | | | | | | | | |
| Taken | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Evening pills | | | | | | | | | | |
| Taken | | | | | | | | | | |
| **Personal Care** | | | | | | | | | | |
| Bath/Shower assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined bath | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Lotion (Non-prescription) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Teeth/Denture care | | | | | | | | | | |
| Dressing Assistance | | | | | | | | | | |
| Hair care (no cutting hair) | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Shaved | | | | | | | | | | |
| Cleaned bedside comode | | | | | | | | | | |
| Changed briefs | | | | | | | | | | |
| Toileting assistance | | | | | | | | | | |
| Declined toileting/incontinence care | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

**Client Signature** *Vera Blima Feldheim*    4/19/24

**Caregiver Signature**    4/19/24

# EXHIBIT 7

LTC    4    01/28/2019    22:44    2

*John Hancock.*

# Claim Initiation Form

**John Hancock Life & Health Insurance Company**
✉ ATTN: R-02-B Long-Term Care

Boston, MA 02117-0852

☎ Phone: ▮▮▮▮▮    Fax: ▮▮▮▮▮

**Insured Name:** Arthur Feldheim

**Claim Number:** ▮▮▮▮▮

## Introduction

Completion of this form may be necessary to begin the claim process. Please be aware that you are required to provide accurate and complete information to the best of your knowledge and ability. Any failure to do so could jeopardize the claim. **Form completion does not guarantee claim approval and/or benefit payment.**

## 1. Demographic Information for Arthur Feldheim

**PLEASE INDICATE THE INSURED'S CURRENT STATUS:**

☑ RECEIVING SERVICES/NEEDS ASSISTANCE    ☐ RECOVERED, RECEIVED SERVICES PRIOR TO RECOVERY    ☐ DECEASED, RECEIVED SERVICES PRIOR TO DEATH

**Primary Residence:**

**Current Location (if not Primary Residence):**

**Facility Name (if applicable)**

**Facility Name (if applicable)**

**Primary Residence Street Address**

LAKEWOOD    N.J.    08701

City/Town    State    Zip Code

**Current Location Street Address**

City/Town    State    Zip Code

**Preferred Contact Phone**

**Preferred Contact Phone**

Married: ☑ YES    ☐ NO    Date of Birth: ▮▮▮▮ / 1942
MM    DD    YYYY

**Who is the primary contact for this claim?**

☑ INSURED    ☐ OTHER: _____

**If INSURED, where should we send claim correspondence?**

☐ PRIMARY RESIDENCE    ☐ CURRENT LOCATION

**If OTHER, please complete the contact information below:**

**Primary Contact Name**

**Relationship to the Insured**

**Primary Contact Street Address**

**Power of Attorney or Guardian for Insured:** ☐ YES    ☐ NO
If YES, attach a copy of the documentation.

City/Town    State    Zip Code

**Preferred Contact Phone**

**Continued on Reverse ➡**

LTCC-INTAKE edition 2/2015

## 2. Claim Information

1. Brief explanation of why claim is being filed: _I had a knee replacement 12 years ago last year internally it became loose and I need a revision_

2. Is this claim being opened because the insured needs assistance with any of the following activities: bathing, dressing, eating, toileting, maintaining continence, mobility, transferring from bed to chair?    ☑ YES ☐ NO

    If YES, the approximate date the assistance began?    [12] / [15] / [2018]
    MM          DD          YYYY

3. Is this claim being opened because the insured needs supervision due to memory or cognitive issues resulting from a diagnosis such as Alzheimer's or dementia?    ☐ YES ☑ NO

    If YES, the approximate date the assistance began?    [ ] / [ ] / [ ]
    MM          DD          YYYY

4. Is this claim being opened for any of the following reasons:
   Result of injuries sustained due to a motor vehicle accident?    ☐ YES ☑ NO
   Result of a work-related injury?    ☐ YES ☑ NO
   Hospice Services?    ☐ YES ☑ NO
       (If YES to Hospice Services, furnish provider detail on the Provider Information Form.)

5. If currently in a Skilled Nursing Facility, please provide the expected discharge date/time frame (if known): _____

6. Is this claim related to more than one John Hancock policy that covers long-term care services?    ☐ YES ☑ NO

    If YES, please list all policy numbers (for group/employer-sponsored plans, list the Employer name):

    _____

## 3. Acknowledgement

**Any person who, with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties. Please refer to enclosed state variation sheet for state-specific wording regarding the above fraud statement.**

Before we can process your claim, you need to certify by signing below that the information you have provided on this form is accurate and complete to the best of your knowledge and ability.

**Sign Here** ➤    _signature_    1/20/19
                    Signature of INSURED or POWER OF ATTORNEY or GUARDIAN    Date

                    _____
                    Print Name of INSURED or POWER OF ATTORNEY or GUARDIAN

**Please note: In order to accept a signature other than the insured's on this form, please submit written authorization (such as Power of Attorney).**

# EXHIBIT 8

01/19/2020    13:30 CARING CONNECTION                                          (FAX)█████        P.001/004



Caring Connections
████████████████
Airmont NY 10952
████████████████████████
████@thecaringconnections.com

# Fax

| To: John Hancock | From: Caring Connections/ Leah Lebovits |
|---|---|
| Fax: ███████████ | Phone: ██████████ |
| Date: 1/20/2020 | Pages w/cover: 3 |

☐ Urgent  ☐ Per Your Request  ☐ For Review  ☐ Please Reply

**Comments:**

**Insured: Arthur Feldheim**

**Dob-█████1942**

**Claim Number-████████**

**POLICY NUMBER ·█████████**

**ATTACHED PLEASE SEE INVOICES**

**SERVICES FROM COMPANION CARE SERVICE January 4ᵗʰ   thru January 17ᵗʰ**

**Please call us should you have any questions**

**Caring connections home care provider**

████████████████

This communication and all attachments are confidential and may be legally privileged. If you are not the intended recipient, (i) please do not read or disclose any content to others, (ii) please notify the sender by reply (e-mail or fax) immediately, and (iii) please destroy this document. Failure to follow this process may be unlawful and subject to prosecution. Thank you for your cooperation.

01/19/2020    13:30 CARING CONNECTION                              (FAX)█████              P.002/004

Caring Connections

█████████████
Airmont NY 10952

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/19/2020 | 3203 |

| Bill To | Ship To |
|---------|---------|
| Arthur Feldheim POLICY# ████ | Arthur Feldheim POLICY# ████ |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | | | 1/19/2020 | | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|-----------|--------|
| 4 | COMP | COMPANION CARE SERVICE01/06/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/07/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/08/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/09/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/10/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/13/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/14/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/15/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/16/2020 | | 36.00 | 144.00 |
| 4 | COMP | COMPANION CARE SERVICE01/17/2020 | | 36.00 | 144.00 |

**Total** $1,440.00

01/19/2020    13:30 CARING CONNECTION                                      (FAX)                P.003/004

# Client Weekly Documentation Log

**FAX** ▮▮▮▮

**Client Name:** Arthur Feldheim   **Policy Number:** ▮▮▮▮   **Caregiver Name:**

**Starting Monday:date:** 1 | 4 | 2020   **Ending Sunday:date:** 1 | 10 | 2020

*Please place a check mark for each service task performed on the day it was provided.*

| | Sat | Sun | M | T | W | THU | FRI | Dates | Time in | Time out | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | | | ✓ | ✓ | ✓ | ✓ | ✓ | M | 10A | 2P | 1-6 |
| personal Care needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | T | 10A | 2P | 1-7 |
| Nutritional needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | W | 10A | 2P | 1-8 |
| **Activities w/ client** | | | ✓ | ✓ | ✓ | ✓ | ✓ | Th | 10A | 2P | 1-9 |
| Entertainment / TV | | | | | | | | | | | |
| Games/cards | | | | | | | | F | 10A | 2P | 1-10 |
| Read book | | | | | | | | | | | |
| Senior Center Visit | | | | | | | | | | | |
| Shopping | | | | | | | | | | | |
| Walking | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Attended event | | | | | | | | | | | |
| Other: | | | | | | | | | | | |
| **Meal prep** | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Prepared B-fast | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Prepared Lunch | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Prepared Dinner | | | | | | | | | | | |
| Declined a meal | | | | | | | | | | | |
| Other: G-tube feeding | | | | | | | | | | | |
| **Errands / Appointments** | | | | | | | | | | | |
| Doctor Visit | | | ✓ | | | | ✓ | | | | |
| Grocery Shopping | | | | | ✓ | | | | | | |
| Other: | | | | | | | | | | | |
| **Housekeeping** | | | ✓ | | | | | | | | |
| Laundry | | | | ✓ | | | | | | | |
| Ironing | | | | ✓ | | | | | | | |
| Vacuum | | | | | ✓ | | | | | | |
| Dust | | | | | | | | | | | |
| Changed bedding | | | | | | | ✓ | | | | |
| Bathrooms | | | | | | | | | | | |
| Tidy, sweep, mop, etc. | | | | ✓ | | | | | | | |
| Empty trash | | | | | | ✓ | | | | | |
| Cleaned kitchen | | | ✓ | | | | ✓ | | | | |
| Other: | | | | | | | | | | | |
| **Medication Reminders** | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Morning pills | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Taken-into g-tub | | | | | | | | | | | |
| Declined | | | | | | | | | | | |
| Afternoon pills | | | | | | | | | | | |
| Taken-into g-tube | | | | | | | | | | | |
| Declined | | | | | | | | | | | |
| Evening pills | | | | | | | | | | | |
| Taken-into g- tube | | | | | | | | | | | |
| **Personal Care** | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Bath/Shower assistance | | | | | | | | | | | |
| Monitored bathing safety only | | | | | | | | | | | |
| Declined bath | | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | | |
| Lotion (Non-prescription) | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Teeth/Denture care | | | | | | | | | | | |
| Dressing Assistance | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Hair care (no cutting hair) | | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | | |
| Shaved | | | | | | | | | | | |
| Cleaned bedside comode | | | | | | | | | | | |
| Changed briefs | | | | | | | | | | | |
| Toileting assistance | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Declined toileting/incontinence care | | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in**

By signing below, I understand that I am confirming that the services checked above were performed in acc
care plan. I also know that if I provide information on this form that I know is false, I will face termination of
I also understand that it is a crime to do so.

**Client Signature** _[signature]_                                1-10-2020

**Caregiver Signature** _[signature]_                          1/10/2020

01/19/2020    13:31 CARING CONNECTION                                    (FAX)          P.004/004



FAX

# Client Weekly Documentation Log

Client Name: Arthur Feldheim  Policy Number _____  Caregiver Name:

Starting Monday:date: 1 11 2020 Ending Sunday:date: 1 17 2020

Please place a check mark for each service task performed on the day it was provided.

| | Sat | Sun | M | T | W | THU | FRI | Dates | Time In | Time out | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | | | ✓ | ✓ | ✓ | ✓ | ✓ | M | 10 A | 2p | 1-13 |
| personal Care needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | T | 10 A | 2p | 1-14 |
| Nutrional needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | W | 10A | 2d | 1-15 |
| **Activities w/ client** | | | | | | | | Th | 10A | 2p | 1-16 |
| Entertainment / TV | | | | | | | | F | 10A | 2p | 1-17 |
| Games/cards | | | | | | | | | | | |
| Read book | | | | | | | | | | | |
| Senior Center Visit | | | | | | | | | | | |
| Shopping | | | | | | | | | | | |
| Walking | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Attended event | | | | | | | | | | | |
| Other: | | | | | | | | | | | |
| **Meal prep** | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Prepared B-fast | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Prepared Lunch | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Prepared Dinner | | | | | | | | | | | |
| Declined a meal | | | | | | | | | | | |
| Other:_ G-tube feeding | | | | | | | | | | | |
| **Errands / Appointments** | | | | | | | | | | | |
| Doctor Visit | | | | | ✓ | | | | | | |
| Grocery Shopping | | | | | | | | | | | |
| Other: | | | | | | | | | | | |
| **Housekeeping** | | | ✓ | | | | | | | | |
| Laundry | | | ✓ | | | | | | | | |
| Ironing | | | | ✓ | | | | | | | |
| Vacuum | | | | | ✓ | | | | | | |
| Dust | | | | | ✓ | | | | | | |
| Changed bedding | | | | | | | | | | | |
| Bathrooms | | | | | | ✓ | | | | | |
| Tidy, sweep, mop, etc. | | | | ✓ | | | | | | | |
| Empty trash | | | | ✓ | | | | | | | |
| Cleaned kitchen | | | ✓ | | | | | | | | |
| Other: | | | | | | | | | | | |
| **Medication Reminders** | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Morning pills | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Taken-into g-tub | | | | | | | | | | | |
| Declined | | | | | | | | | | | |
| Afternoon pills | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Taken-into g-tube | | | | | | | | | | | |
| Declined | | | | | | | | | | | |
| Evening pills | | | | | | | | | | | |
| Taken-into g- tube | | | | | | | | | | | |
| **Personal Care** | | | ✓ | ✓ | ✓ | ✓ | | | | | |
| Bath/Shower assistance | | | | | | | | | | | |
| Monitored bathing-safety only | | | | | | | | | | | |
| Declined bath | | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | | |
| Lotion (Non-prescription) | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Teeth/Denture care | | | | | | | | | | | |
| Dressing Assistance | | | ✓ | ✓ | ✓ | ✓ | | | | | |
| Hair care (no cutting hair) | | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | | |
| Shaved | | | | | | | | | | | |
| Cleaned bedside comode | | | | | | | | | | | |
| Changed briefs | | | | | | | | | | | |
| Toileting assistance | | | ✓ | ✓ | ✓ | ✓ | | | | | |
| Declined toileting/incontinence care | | | | | | | | | | | |

***Please notify office if client requests additional personal care services that are not noted in·
By signing below, I understand that I am confirming that the services checked above were performed in acc
care plan. I also know that if I provide information on this form that I know is false, I will face termination of
I also understand that it is a crime to do so.

Client Signature _____ 1-17-2020

Caregiver Signature _____ 1/17/2020

# EXHIBIT 9



## Policy Information

███████████████████████████████

## Invoice Details

**Provider:** Caring Connections                **Total Charges:** $9,030.00

**Service Date From:** 01/28/2023              **Service Date To:** 02/10/2023

**Submitted By:** Caring Connections

**Date Submitted:** 02/13/2023                 **Phone Number:**

████████████@thecaringconnections.com

**Q1: Were the care services performed at home?**
Yes

**Q1a. If No, where were they performed and on what dates?**
N/A

**Additional Information:**

**Fraud Attestation:**

☑    I attest to the knowledge that an individual who submits an invoice with an intent to defraud or
knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim
containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal
and civil penalties.

I-1230774

FAX ████

# Client Weekly Documentation Logs

**Client Name:** Yera Blimu Feldheim     **Caregiver Name:**

**Starting Saturday :date:** 2/4/23  **Ending Friday :date:** 2/10/23

*Please place a check mark for each service task performed on the day it was provided*

| | S | S | M | T | W | TH | F | Dates | Time In | Time Out |
|---|---|---|---|---|---|---|---|---|---|---|
| Monitor patient safety | √ | √ | √ | √ | √ | √ | √ | | | |
| personal Care needs met | √ | √ | √ | √ | √ | √ | √ | | | |
| Nutritional needs met | √ | √ | √ | √ | √ | √ | √ | Sat. | 8am | 9pm |
| Mobility/Activity | | | | | | | | Sun | 8am | 9pm |
| Ambulation Assistance | √ | √ | √ | √ | √ | √ | √ | | | |
| Cane / Walker Assistance | √ | √ | √ | √ | √ | √ | √ | Mon | 8am - | 9pm |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment / TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| TRANSFERING | | | | | | | | Tue | 8am - | 9pm |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| Meal Preparation | | | | | | | | | | |
| Prepared B/fast | √ | √ | √ | √ | √ | √ | √ | Wed | 8am - | 9pm |
| Prepared Lunch | √ | √ | √ | √ | √ | √ | √ | | | |
| Prepared Dinner | √ | √ | √ | √ | √ | √ | √ | | | |
| Prepared Snack | | | | | | | | Thur. | 8am - | 9pm |
| Total Feeding | | | | | | | | | | |
| Feeding Assistance | | | | | | | | | | |
| Declined a meal | | | | | | | | Fri. | 8am - | 9pm |
| Errands / Appointments | | | | | | | | | | |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Errands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| Housekeeping | | | | | | | | | | |
| Laundry | | | | | | | | | | |
| Change Linen | | | | | | | | | | |
| Vacuum | | √ | | | √ | | | | | |
| Dusting | | | | | | | | | | |
| Clean Bedroom | √ | | | √ | | √ | | | | |
| Clean Bathroom | √ | √ | √ | √ | √ | √ | √ | | | |
| Clean Dining/ Living Room | | | | | | | | | | |
| Mop / Sweep | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| Medication Reminders | | | | | | | | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| Personal Care | | | | | | | | | | |
| Tub Bath/Shower assistance | √ | √ | √ | √ | | √ | √ | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Monitored bathing safely only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth /Denture care | | | | | | | | | | |
| Dressing Assistance | √ | √ | √ | √ | √ | √ | √ | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | √ | √ | √ | √ | √ | √ | √ | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | √ | √ | √ | √ | √ | √ | √ | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Commode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.**

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

**Client Signature**

**Caregiver Signature** _[signature]_     2/18/23

Scanned with CamScanner

# Client Weekly Documentation Logs

**Client Name:** Vera Blimu Feldheim  
**Caregiver Name:**  
**Starting Saturday date:** 1/28/23 **Ending Friday date:** 2/3/23

Please place a check mark for each service task performed on the day it was provided

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter Patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | Sat. | 8am | 9pm |
| Mobility/Activity | | | | | | | | Sun | 8am | 9pm |
| Ambulation Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Cane / Walker Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | Mon | 8am - 9pm |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment / TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| TRANSFERING | | | | | | | | Tue | 8am - 9pm |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| Meal Preparation | | | | | | | | | | |
| Prepared b-fast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | Wed | 8am - 9pm |
| Prepared Lunch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Snack | | | | | | | | Thur. | 8am - 9pm |
| Total Feeding | | | | | | | | | | |
| Feeding Assistance | | | | | | | | | | |
| Declined a meal | | | | | | | | Fri. | 8am - 9pm |
| Errands / Appointments | | | | | | | | | | |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Errands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| Housekeeping | | | | | | | | | | |
| Laundry | | | | | | | | | | |
| Change Linen | | | | | | | | | | |
| Vacuum | ✓ | | | ✓ | | | | | | |
| Dusting | | | | | | | | | | |
| Clean Bedroom | ✓ | | ✓ | | | ✓ | | | | |
| Clean Bathrooms | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Dining/ Living Room | | | | | | | | | | |
| Mop / Sweep | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| Medication Reminders | | | | | | | | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| Personal Care | | | | | | | | | | |
| Tub Bath/Shower assistance | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth / Denture care | | | | | | | | | | |
| Dressing Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Commode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.**
By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

**Client Signature**  
**Caregiver Signature**

Scanned with CamScanner

# Invoice

| Date | Invoice # |
|---|---|
| 2/13/2023 | 11579 |

██████████████████
Airmont NY 10952

| Bill To |
|---|
| Vera Blimy   Feldheim |
| ██████████████ |
| Monsey, NY 10952 |

| Ship To |
|---|
| Vera Blimy   Feldheim |
| ██████████████ |
| Monsey, NY 10952 |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| | | | 2/13/2023 | | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | COMP | COMPANION CARE SERVICE 1/28/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 1/29/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 1/30/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 1/31/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/01/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/02/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/03/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/04/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/05/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/06/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/07/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/08/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/09/2023 | | 645.00 | 645.00 |
| 1 | COMP | COMPANION CARE SERVICE 2/10/2023 | | 645.00 | 645.00 |

**Total** $9,030.00

| Phone # | Fax # | E-mail |
|---|---|---|
| ███████████████████████ | | @thecaringconnections.com |

# EXHIBIT 10



## Policy Information

███████████████████████████████████████████

## Invoice Details

**Provider:** Caring Connections                    **Total Charges:** $2,016.00

**Service Date From:** 01/30/2023                   **Service Date To:** 02/12/2023

**Submitted By:** Caring Connections

**Date Submitted:** 02/13/2023                      **Phone Number:**

████████████████@thecaringconnections.com

**Q1: Were the care services performed at home?**
Yes

**Q1a. If No, where were they performed and on what dates?**
N/A

**Additional Information:**

**Fraud Attestation:**

☑ I attest to the knowledge that an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties.

I-1230779

# **Invoice**

| Date | Invoice # |
|------|-----------|
| 2/13/2023 | 11580 |

███████████████████████
Airmont NY 10952

| Bill To | Ship To |
|---------|---------|
| Arthur Feldheim<br>████████████████ | Arthur Feldheim<br>████████████████ |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | | | 2/13/2023 | | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|------------|--------|
| 4 | COMP | COMPANION CARE SERVICE 01/30/2023 | | 42.00 | 168.00 |
| 4 | COMP | COMPANION CARE SERVICE 01/31/2023 | | 42.00 | 168.00 |
| 4 | COMP | COMPANION CARE SERVICE 02/1/2023 | | 42.00 | 168.00 |
| 6 | COMP | COMPANION CARE SERVICE 02/2/2023 | | 42.00 | 252.00 |
| 6 | COMP | COMPANION CARE SERVICE 02/3/2023 | | 42.00 | 252.00 |
| 4 | COMP | COMPANION CARE SERVICE 02/6/2023 | | 42.00 | 168.00 |
| 4 | COMP | COMPANION CARE SERVICE 02/7/2023 | | 42.00 | 168.00 |
| 4 | COMP | COMPANION CARE SERVICE 02/8/2023 | | 42.00 | 168.00 |
| 6 | COMP | COMPANION CARE SERVICE 02/9/2023 | | 42.00 | 252.00 |
| 6 | COMP | COMPANION CARE SERVICE 02/10/2023 | | 42.00 | 252.00 |

**Total** $2,016.00

| Phone # | Fax # | E-mail |
|---------|-------|--------|
| ███████████████████████ | | @thecaringconnections.com |

FAX ████████

## Client Weekly Documentation Log

Client Name: Arthur Feldheim   Policy Number 1330044   Caregiver Name:

Starting Monday date: 2/6/23   Ending Sunday date: 2/12/23

Please place a check mark for each service task performed on the day it was provided

| | Sat | Sun | M | T | W | THU | FRI | Dates | Time in | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Monitor patient safety | | | ✓ | ✓ | ✓ | ✓ | ✓ | 2/6 | 10A | 2P |
| Personal Care needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | 2/7 | 10A | 2P |
| Nutritional needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | 2/8 | 10A | 2P |
| Activities w/ client | | | ✓ | ✓ | ✓ | ✓ | ✓ | 2/9 | 10A | 2P |
| Entertainment / TV | | | | | | | | 2/10 | 10A | 2P |
| Games/cards | | | | | | | | | | |
| Read book | | | | | | | | | | |
| Senior Center Visit | | | | | | | | | | |
| Shopping | | | | | | | | | | |
| Walking | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Attended event | | | | | | | | | | |
| Other: | | | | | | | | | | |
| Meal prep | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Brkfst | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Lunch | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Declined a meal | | | | | | | | | | |
| Other: G-tube feeding | | | | | | | | | | |
| Errands / Appointments | | | | | | | | | | |
| Doctor Visit | | | | | | | | | | |
| Grocery Shopping | | | | | | | | | | |
| Housekeeping | | | | | | | | | | |
| Laundry | | | ✓ | | | | | | | |
| Ironing | | | | ✓ | | | | | | |
| Vacuum | | | | | | ✓ | | | | |
| Dust | | | ✓ | | | ✓ | | | | |
| Changed bedding | | | | ✓ | | | | | | |
| Bathrooms | | | | | ✓ | | | | | |
| Tidy, sweep, mop, etc | | | | | | | | | | |
| Empty trash | | | ✓ | | ✓ | | ✓ | | | |
| Cleaned Kitchen | | | | ✓ | | | | | | |
| Other: | | | | | | | | | | |
| Medication Reminders | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Morning pills | | | | | | | | | | |
| Taken into g-tube | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Afternoon pills | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Taken into g-tube | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Evening pills | | | | | | | | | | |
| Taken into g-tube | | | | | | | | | | |
| Personal Care | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Bath/Shower assistance | | | ✓ | ✓ | ✓ | ✓ | | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined bath | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Lotion (Non-prescription) | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Teeth/Denture care | | | | | | | | | | |
| Dressing Assistance | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Hair care (no cutting hair) | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Shave | | | | | | | | | | |
| Cleaned bedside commode | | | | | | | | | | |
| Changed briefs | | | | | | | | | | |
| Toileting assistance | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Declined toileting/incontinence care | | | | | | | | | | |

**Please notify office if client reports additional personal care services that are not noted in...

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of... I also understand that it is a crime to do so.

Client Signature _____   2/12/23

Caregiver Signature _____   2/12/23

Scanned with CamScanner

FAX ███████

# Client Weekly Documentation Log

Client Name: Arthur Feldheim  Policy Number: 1380044  Caregiver Name:

Starting Monday date: 1/30/23  Ending Sunday date: 2/5/23

*Please place a check mark for each service task performed on the day it was provided*

| | Sat | Sun | M | T | W | THU | FRI | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Monitor patient safety | | | ✓ | ✓ | ✓ | ✓ | ✓ | 1/30 | 10A | 20 |
| Personal Care needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | 1/31 | 10A | 20 |
| Nutritional needs met | | | ✓ | ✓ | ✓ | ✓ | ✓ | 2/1 | 10A | 20 |
| Activities w/ client | | ✓ | ✓ | | ✓ | ✓ | ✓ | 2/2 | 10A | 20 |
| Entertainment / TV | | | | | | | | 2/3 | 10A | 20 |
| Games/cards | | | | | | | | | | |
| Read book | | | | | | | | | | |
| Senior Center Visit | | | | | | | | | | |
| Shopping | | | | | | | | | | |
| Walking | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Attended event | | | | | | | | | | |
| Other: | | | | | | | | | | |
| Meal prep | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Bfast | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Lunch | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Declined a meal | | | | | | | | | | |
| Other: Gtube feeding | | | | | | | | | | |
| Errands / Appointments | | | | | | | | | | |
| Doctor Visit | | | | | | | | | | |
| Grocery Shopping | | | | | | | | | | |
| Other: | | | | | | | | | | |
| Housekeeping | | | ✓ | | | | | | | |
| Laundry | | | | | ✓ | | | | | |
| Dishes | | | | | ✓ | | | | | |
| Vacuum | | | | | | ✓ | | | | |
| Dust | | | ✓ | | | | ✓ | | | |
| Changed bedding | | | | ✓ | | | | | | |
| Bathroom | | | | | | ✓ | | | | |
| Tidy sleep, mop, etc | | | | | | | | | | |
| Empty trash | | | ✓ | | ✓ | | ✓ | | | |
| Cleaned kitchen | | | | ✓ | | | | | | |
| Other: | | | | | | | | | | |
| Medication Reminders | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Morning pills | | | | | | | | | | |
| Taken into g-tube | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Afternoon pills | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Taken into g-tube | | | | | | | | | | |
| Declined | | | | | | | | | | |
| Evening pills | | | | | | | | | | |
| Taken into g-tube | | | | | | | | | | |
| Personal Care | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Bath/Shower assistance | | | ✓ | | ✓ | | ✓ | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined bath | | | | | | | | | | |
| Bed Bath/Sponge Bath | | | | | | | | | | |
| Lotion (Non-prescription) | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Teeth/Denture care | | | | | | | | | | |
| Dressing Assistance | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Hair care (no cutting hair) | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Shaved | | | | | | | | | | |
| Cleaned bedside commode | | | | | | | | | | |
| Changed briefs | | | | | | | | | | |
| Toileting assistance | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Declined toileting/incontinence care | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in**

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of [...] I also understand that this is a crime to do so.

Client Signature _____  2/5/23

Caregiver Signature _____  2/5/23

Scanned with CamScanner

# EXHIBIT 11

# John Hancock

# Home Health Care Form

John Hancock Life Insurance Company (U.S.A.) (not licensed in New York)
John Hancock Life & Health Insurance Company
ATTN: R-02-B Long-Term Care

▮▮▮▮▮

Boston, MA 02117

Phone: ▮▮▮▮▮▮▮▮▮▮

**Insured Name:** _____

**Claim Number:** _____

The above named insured has presented or is considering a claim for charges covered by your agency. Please complete the Provider Information section. If you are a state-licensed facility, include a copy of your state license. Then complete the Questionnaire.

## Provider Information

Legal Name of Business: Caring Connections

Doing Business As: N/A

Street Address: ▮▮▮▮▮▮▮

City / Town: Airmont     State: NY     Zip: 10952

Phone: ▮▮▮▮▮     Fax: ▮▮▮▮▮     Email: ▮▮▮ a the Carry Connections. Com

Is this a licensed business?        ☒ YES  ☐ NO

If YES, include a copy of the state license.

Is this a Medicare Certified business?     ☐ YES  ☒ NO          CERTIFICATION NUMBER: ▮▮▮▮▮

If YES, has this facility billed Medicare for services provided to this insured?     ☐ YES  ☒ NO

## Questionnaire

1. Does this business act as a payroll service only?        ☐ YES  ☒ NO

2. Does this business directly compensate the care provider for services rendered?        ☒ YES  ☐ NO

3. Does this business supervise and monitor the care providers?        ☒ YES  ☐ NO

4. Does this business maintain notes of care for each date of service provided to the insured?    ☒ YES  ☐ NO

5. Identify the type(s) of care the business provides within the scope of the business license / certification:

☒ BATHING  ☐ DRESSING  ☐ EATING  ☒ TOITLETING  ☒ TRANSFERRING  ☐ CONTINENCE  ☒ HOMEMAKING  ☒ COMPANION

**Continued on Reverse** ➔

LTCC HHC edition 5/2014

6.   Staff regularly in attendance at agency:

|  | # of Employees |  | # of Employees |
|---|---|---|---|
| Registered Nurse | 3 | Certified Home Health Aide | 30 |
| Licensed Practical Nurse/ Licensed Vocational Nurse | 0 | Non-Certified Personnel | 0 |
| Certified Nurse Assistant | 0 | Other: (specify) | |

## Acknowledgment

I certify that the information above accurately represents this home care provider's operations.

**Any person who, with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties. Please refer to enclosed state variation sheet for state-specific wording regarding the above fraud statement.**

Sign Here ➤

_____                    8-21/24
**Signature of Administrator**                           **DATE**

Leah Leborts
**Print Name**

Ceu
**Title**

# EXHIBIT 12



## Policy Information

███████████████████████████████████████████████

## Invoice Details

**Provider:** Caring Connections LLC

**Service Date From:** 02/03/2019

**Submitted By:** blime feldheim

**Date Submitted:** 02/18/2019

**Email Address:** ███@thecaringconnections.com

**Total Charges:** $7,200.00

**Service Date To:** 02/17/2019

**Phone Number:** ████████████

**Q1: Were the care services performed at home?**
Yes

**Q1a. If No, where were they performed and on what dates?**
N/A

**Additional Information:**

**Fraud Attestation:**

☑ I attest to the knowledge that an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties.

I-151413

Caring Connections

███████████

Airmont NY 10952

███████████████

███ @thecaringconnections.com



# Fax

| To: John Hancock | From: Caring Connections/ Leah Lebovits |
|---|---|
| -- <br> Fax: ████████ | Phone: ████████ |
| Date: 2/18/2019 | Pages w/cover: |

☐ Urgent   ☐ Per Your Request   ☐ For Review   ☐ Please Reply

**Comments:**

**Insured: Blime Feldheim**

**Dob-**████**1946**

**Claim Number-**████████

**POLICY NUMBER -**██████

ATTACHED PLEASE SEE INVOICES AND CARE NOTES

SERVICES FROM February 2nd thru February 15th

Please call us should you have any questions

Caring connections home care provider

███████████

This communication and all attachments are confidential and may be legally privileged. If you are not the intended recipient, (i) please do not read or disclose any content to others, (ii) please notify the sender by reply (e-mail or fax) immediately, and (iii) please destroy this document. Failure to follow this process may be unlawful and subject to prosecution. Thank you for your cooperation.

# Invoice

Caring Connections

Airmont NY 10952

| Date | Invoice # |
|---|---|
| 2/18/2019 | 2091 |

| Bill To | Ship To |
|---|---|
| Vera Blimy  Feldheim<br><br>Monsey, NY 10952 | Vera Blimy  Feldheim<br><br>Monsey, NY 10952 |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
|  |  |  | 2/18/2019 |  |  |  |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | COMP | COMPANION CARE SERVICE 02/03/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/04/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/05/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/06/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/07/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/08/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/09/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/10/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/11/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/12/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/13/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/14/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/15/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/16/2019 |  | 480.00 | 480.00 |
| 1 | COMP | COMPANION CARE SERVICE 02/17/2019 |  | 480.00 | 480.00 |

| Total | $7,200.00 |
|---|---|

FAX

*A Senior Home
Care Company*

# Client Weekly Documentation Logs

Client Name: Vera Blimu Feldheim          Caregiver Name:

Starting Saturday :date: 2/2/19 Ending Friday :date:  2/8/19

*Please place a check mark for each service task performed on the day it was provided*

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| **Mobitity/Activity** | | | | | | | | | | |
| Ambulation Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Cane/ Walker Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment / TV | | ✓ | | | | | | | | |
| Games/cards | | | | | | | | | | |
| **TRANSFERING** | | | | | | | | | | |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| **Meal Preparation** | | | | | | | | | | |
| Prepared B-fast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Lunch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Snack | | | | | | | | | | |
| Total Feeding | | | | | | | | | | |
| Feeding Assistance | | | | | | | | | | |
| Declined a meal | | | | | | ✓ | | | | |
| **Errands / Appointments** | | | | | | | | | | |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Errands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| **Housekeeping** | | | | | | | | | | |
| Laundry | | | | | | | | | | |
| Change Linen | | | | | | | | | | |
| Vacuum | | ✓ | | | ✓ | | | | | |
| Dusting | | | | | | | | | | |
| Clean Bedroom | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Bathrooms | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Dining/ Living Room | | | | | | ✓ | ✓ | | | |
| Mop / Sweep | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| **Medication Reminders** | | | | | | | | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| **Personal Care** | | | | | | | | | | |
| Tub Bath/Shower assistance | | | | | | | | | | |
| Bed Bath/Sponge Bath | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth /Denture care | | | | | | | | | | |
| Dressing Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | ✓ | | | ✓ | | | ✓ | | | |
| Diaper change | | | | | | | | | | |
| Toileting assistance | | | | | | | | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Comode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

Client Signature

Caregiver Signature          2-08-19

Feldheim

2/8/19

FAX

*A Senior Home Care Company*

# Client Weekly Documentation Logs

Client Name: Vera Blimy Feldheim          Caregiver Name:

Starting Saturday :date: 2/9/19 ; Ending Friday :date: 2/15/19

*Please place a check mark for each service task performed on the day it was provided*

| | S | S | M | T | W | TH | F | Dates | Time In | Time out |
|---|---|---|---|---|---|---|---|---|---|---|
| Moniter patient safety | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| personal Care needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Nutritional needs met | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| **Mobitity/Activity** | | | | | | | | | | |
| Ambulation Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Cane / Walker Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Wheelchair Assistance | | | | | | | | | | |
| Entertainment / TV | | | | | | | | | | |
| Games/cards | | | | | | | | | | |
| **TRANSFERING** | | | | | | | | | | |
| Transfer board | | | | | | | | | | |
| Stand / Pivot | | | | | | | | | | |
| Hoyer Lift | | | | | | | | | | |
| **Meal Preparation** | | | | | | | | | | |
| Prepared B-fast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Lunch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Dinner | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Prepared Snack | | | | | | | | | | |
| Total Feeding | | | | | | | | | | |
| Feeding Assistance | | | | | | | | | | |
| Declined a meal | | | | | | | ✓ | | | |
| **Errands / Appointments** | | | | | | | | | | |
| Medical Appointments | | | | | | | | | | |
| Shopping/ Errands | | | | | | | | | | |
| Community Outings | | | | | | | | | | |
| **Housekeeping** | | | | | | | | | | |
| Laundry | | | | | | | | | | |
| Change Linen | | | | | | | | | | |
| Vacuum | | | ✓ | | | ✓ | | | | |
| Dusting | | | | | | | | | | |
| Clean Bedroom | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Bathrooms | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Clean Dining/ Living Room | | | | | | | | | | |
| Mop / Sweep | | | | | | | | | | |
| Empty trash | | | | | | | | | | |
| Refrigerator / Stove | | | | | | | | | | |
| Cleaned kitchen | | | | | | | | | | |
| **Medication Reminders** | | | | | | | | | | |
| Medication Assistance | | | | | | | | | | |
| Declined medication | | | | | | | | | | |
| **Personal Care** | | | | | | | | | | |
| Tub Bath/Shower assistance | | | | | | | | | | |
| Bed Bath/Sponge Bath | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Monitored bathing safety only | | | | | | | | | | |
| Declined Bath | | | | | | | | | | |
| Oral Hygiene | | | | | | | | | | |
| Teeth /Denture care | | | | | | | | | | |
| Dressing Assistance | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Hair care comb/brush | | | | | | | | | | |
| Shampoo | | | | | | | | | | |
| Nail care (no trimming nails) | | | | | | | | | | |
| Skin care / Foot care | ✓ | | | ✓ | | | | | | |
| Diaper change | | | | ✓ | | | ✓ | | | |
| Toileting assistance | | | | | | | | | | |
| Ostomy Care | | | | | | | | | | |
| Catheter Care | | | | | | | | | | |
| Comode / Bed pan assistance | | | | | | | | | | |

**Please notify office if client requests additional personal care services that are not noted in this client's care plan.

By signing below, I understand that I am confirming that the services checked above were performed in accordance with the care plan. I also know that if I provide information on this form that I know is false, I will face termination of my employment & I also understand that it is a crime to do so.

Client Signature

Caregiver Signature                                    2-15-19

2/15/19